920 A.2d 1118

**William BECKER, et ux.**

v.

**ANNE ARUNDEL COUNTY, et al.**

**No. 1097, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

April 9, 2007.

116

Charles R. Schaller (Caroline L. Hecker, on the brief), Annapolis, MD, for Appellant.

Eileen E. Powers and James A. Chance (Harry C. Blumenthal, Jonathan A. Hodgson, County Attorney, on the briefs), Annapolis, MD, for Appellee.

Panel: SALMON, JAMES R. EYLER, CHARLES E. MOYLAN, JR., (Ret., specially assigned), JJ.

EYLER, JAMES R., J.

William and Jane Becker, appellants, requested three variances from the Anne Arundel County Board of Appeals (the "Board"), which variances were necessary to construct a home on their property fronting on the Magothy River and Park Creek in Pasadena. In accordance with the Anne Arundel County Charter (the "Charter"), the requests for variances were initially heard by the County's Administrative Hearing Officer,[1] and the decision was subsequently appealed to the Board.[2] The Board conducted a hearing *de novo*[3] on the variance requests. In addition to appellants, participants at the hearing were Anne Arundel County, through its Office of Planning and Zoning, and protestants Richard Roeder, Jr., Alan Cohen, Ross Koch, Michael Warner, Ron Baker, Gary

---

**1.** § 535(b) provides that "the Administrative Hearing Officer may grant variances from and make special exceptions to the zoning laws, regulations, ordinances or resolutions."

**2.** The Charter § 536(a) and (c) provide that an appeal may be taken to the Board by any person aggrieved by the decision and a party to the proceedings of the Administrative Hearing Officer. According to the Board's opinion, the Hearing Officer (1) granted a conditional "modified variance to permit a dwelling with less buffer;" (2) granted a conditional variance "to permit a dwelling with less setbacks than required and with disturbance to steep slopes;" and, (3) granted a conditional variance "to permit installation of a septic system with less buffer and disturbance to steep slopes."

**3.** The Charter § 603 provides that "[a]ll decisions by the County Board of Appeals shall be made after notice and hearing de novo upon the issues before the Board."

Koch, and James Franz, collectively appellees.[4] The Board denied the variances, and pursuant to § 604 of the Charter, appellants timely appealed the Board's decision to the Circuit Court for Anne Arundel County. After a hearing, the circuit court, by memorandum opinion and order dated June 16, 2006, affirmed the Board's decision, denying appellants' requested variances. This appeal followed. We shall reverse the circuit court's judgment and remand to circuit court with instructions to vacate the Board's decision and remand to the Board for further proceedings consistent with this opinion.

## Factual Background

In November 1998, appellants purchased two adjoining parcels of land located off of Trails End Road in Pasadena. Parcel 1 consists of 1.60 acres and is improved with a dwelling in which appellants reside. Parcel 2 consists of 0.67 acres, or 23,136 square feet, and is undeveloped. Both parcels front on the Magothy River, with a small portion of Parcel 2 fronting on Park Creek. The zoning classification of both parcels is "R2," residential, and both parcels are designated limited development areas under the County's "critical area" program. *See* Anne Arundel County Code (the "Code"), Art. 28.[5] Appellants wished to build a home on Parcel 2 and, if possible, sell the existing home on Parcel 1.

Some time in 1999, appellants initiated an investigation into building a two-story ranch style home on Parcel 2. Ultimately, with the approval of the Office of Planning and Zoning, the proposed structure was to consist of 2,499 square feet of living space with 1,755 devoted to the first floor and 744 devoted to the second floor. Additionally, a 529 square foot two-car garage was proposed, bringing the total area of the house to 3,028 square feet. The interior of the house was to consist of 3 bedrooms, with 2 guest bedrooms on the second floor, and with the master bedroom and the majority of the living space

---

4. Anne Arundel County, represented by its County Attorney, filed a brief supporting all but one of appellants' contentions.

5. Now codified in Article 18; *see* "Applicable Law" discussion, *infra*.

on the first floor. The asserted reason for the larger first floor living space was that Mrs. Becker has Lyme Disease.

Appellants learned that Parcel 2 is a legal buildable existing lot,[6] but that due to the property's close proximity to tidal waters, the entire parcel is within the Chesapeake Bay Critical Area, which subjects it to certain regulations. Parcel 2 is described as irregularly shaped, likened to a "pork chop." It consists of a low grassy area that is not suitable for building, a sandy beach, and a wooded area. The parcel is also affected by steep slopes adjacent to the shoreline. At its widest point, Parcel 2 is only 122 feet. Consequently, 97% of the property is located within the 100–foot critical area buffer. As there is no suitable portion of land for building outside of the buffer zone due to the topography of the land, the lot can not be developed without obtaining variances from the strict requirements of the zoning ordinance and critical area program.

After appellants purchased Parcel 2, they sought approval from the Health Department to put a septic system on it; however, Parcel 2 did not pass soil percolation tests. Percolation tests on Parcel 1 were successful, and consequently, appellants' home builder proposed using a portion of Parcel 1 for the septic disposal area. The septic system would be subject to a recorded easement, and would pump from Parcel 2 to a mound system located on Parcel 1. Pursuant to this plan, the Health Department approved construction of a house on Parcel 2, not to exceed 2,500 square feet of living area.

Due to the location of the septic system as well as a potable well located in the northwest portion of Parcel 2, the geographic constraints, and existing flood plains, appellants contend that their proposal for the placement and configuration of the house on Parcel 2 is the most reasonable option.

In 2003, before undertaking to develop Parcel 2, appellants applied for three variances seeking relief from three provi-

---

**6.** Parcels 1 and 2 are lots in the platted subdivision of The Park at North Shore. In 1983, the County recognized that parcel 2 was a legal buildable lot.

sions of the Code, specifically Article 28, §§ 1A–104 (a)(1), 1A–105 (d), and 2–405(a)(3). Article 28, § 1A–104 (a)(1) provided that "there shall be a minimum 100–foot buffer landward from the mean high-water line of tidal waters, tributary streams, and tidal wetlands. . . ." Appellants' proposed dwelling would be located 44–feet from the shoreline; thus a variance of 56 feet from the critical area buffer was requested. Article 28, § 1A–105 (d) provided that "[d]evelopment on slopes of 15% or greater as measured before development is not permitted in limited and resource conservation areas unless the project is the only effective way to maintain or improve the stability of the slope. . . ." In order for appellants to install the septic system, the steep slopes on both Parcel 1 and Parcel 2 would have to be "temporarily" disturbed, requiring a variance. Article 28, § 2–405(a)(3) provided that "[e]ach lot in an R2–Residential District shall have . . . a rear yard that is at least 25 feet deep." Appellants' proposal allowed for a rear yard of 15 feet to the property line abutting Trails End Road; thus, a variance of 10 feet to the rear yard setback requirements was requested. The first two requests were for variances from the critical area program. The request for a variance from the setback requirement was a request under general zoning requirements, not a request under the critical area law.

On April 28, 2004, and September 1, 2004, the Board conducted hearings on appellants' variance requests. At the hearings, appellants presented testimony and exhibits in support of their requests for variances. A summary of the relevant evidence follows.

Mr. Becker testified that in the area surrounding Parcel 2, there are homes ranging in size from 1,700 square feet up to 9,000 square feet. He stated that there were only one or two homes in the area smaller than the home he proposed to build. On direct examination, he stated that he wanted to build a retirement home for himself and his wife, who has "chronic Lyme Disease and we wanted to have a handicap accessible home with a master bedroom on the first floor." When examined by the Board, and asked why he and his wife would not instead try to remodel the existing house on Parcel 1 to

suit their needs, Mr. Becker responded "[w]ell, we really don't like the design of the house, the style of the house. It's not handicap accessible the way it is. And there's too many stairs. But primarily we just don't like the house. We'd like to build our own little dream house, if you will." Mr. Becker also testified that in 2002, both he and Mrs. Becker cleared some "sticker bushes" on their property with hand clippers.

Appellants submitted as an exhibit a "revised" floor plan that was smaller than the plan for which they had originally applied. The revised plan included a smaller garage and reduced decks. Additionally, some covered porches were removed. Mr. Becker testified that the requested variances would not substantially impair the use and development of adjacent properties because they were already developed.

Paul Miller, accepted by the Board as an expert in land surveying, testified that without the variance allowing appellants to build within the 100–foot buffer, appellants would not be able to build a house on Parcel 2. He stated that appellants requested the minimum necessary to be able to build on Parcel 2. He stated that appellants' plan should not have any adverse impact on water quality, and that it was not contrary to the intent of the critical area program. On cross-examination, Mr. Miller admitted that if the garage was removed and the first floor of the house was made smaller, there would be less of an impact to the critical area, and less of a variance would be required.

Thomas Brown, Jr., appellants' home builder, testified that a parking pad could be built in lieu of a garage and, if the house was narrowed and elongated, less of a variance would be needed.

Richard Sellers, an environmental engineer who prepared the critical area report for Parcel 2, testified that the proposed house was sited at the "proper point on the property," and the granting of the variances would not be contrary to the spirit and intent of the critical area program.

On August 17, 2005, the Board issued a memorandum opinion denying appellants' requests. In pertinent part, the opinion provided as follows.

Development within the Chesapeake Bay Critical Area ... has been the subject of much legislative effort and protection by the General Assembly. Despite several court decisions that sought to lessen the power of the Critical Area Regulations, the General Assembly responded directly to these court decisions and in each case has subsequently strengthened the Critical Area Regulations. The current Critical Area variance criteria are very strict. The statute requires the Board to presume that the requested development activity does not conform to the general purpose and intent of the Critical Area Program. *See*, Maryland Annotated Code, Natural Resources Article, Section 8–1808(d)(2)(i). Additionally, "unwarranted hardship" is defined as "without a variance, an applicant would be denied a reasonable and significant use of the *entire* parcel or lot for which the variance is requested." *Emphasis added.* (emphasis added in original). To qualify for a variance to the Critical Area criteria, an applicant must meet each and every one of the variance provisions. *See, id.*, Section 8–1808(d)(4)(ii). An applicant must also prove that if the variance were denied, the applicant would be deprived of a use or structure permitted to others in accordance with the Critical Area Program. *See, id.*, Section 8–1808(d)(4)(iii). Given these provisions of the State criteria for the grant of a variance, the burden on an applicant seeking a variance is very high.

The State statute requires that local jurisdictions adopt a program to protect the Critical Area. *Anne Arundel County's local Critical Area variance program contains 12 separate criteria.* *See*, Code, Article 3, Board of Appeals, Section 2–107. *Each of these individual criteria must be met.* If the applicant fails to meet just *one* of these 12 criteria, the variance is *required* to be denied.

(emphasis both added and in original).

\* \* \*

*An applicant for a variance to the Critical Area Program must meet each and every one of the variance criteria. If*

an application fails to meet even one of the criteria, the variance must be denied. In the instant case, we find that the [appellants] have failed to meet their burden of proof regarding several of the variance criteria.[2][7] Thus, a variance cannot be granted in this appeal.

(emphasis added).

> *Most significantly, the [appellants] failed to prove to this Board that the variances requested are the minimum variance necessary* [3][8] *to afford relief to the applicant.* See, id., Section 2–107(c)(1). The [appellants] are requesting sufficient variances to construct a home having a footprint of 1,700+ square feet.... The testimony ... revealed that a 1,700 square foot house is significantly larger than the smallest house in the neighborhood. Therefore, the [appellants] proposal to construct a larger than minimal (for this neighborhood) home on this property that is consumed by sensitive environmental features.

(emphasis added).

> The Health Department has limited the development capability of the site to a home having no more than 2,600 square feet of living space due to the difficulties with septic capacity on this property.... Interestingly, the applicants have proposed the construction of a 2,500 square foot home. There was no explanation why 2,500 square feet of living area was necessary. We are left wondering, why not 2,490 square feet, 2,200 square feet or 600 square feet?
>
> \* \* \*
>
> Additionally, why not construct a home with a footprint smaller than 1,700 square feet? If the structure had a

7. "To complete the analysis of this request, we specifically find that the Petitioners have met their burden regarding several of the Critical Area variance criteria, specifically, Section 2–107(b)(4)(i), (b)(4)(ii), and (c)(2)(i). Therefore, further discussion of these points is not necessary."

8. "This is a factual determination[s] whereby reasonable minds can disagree. Witness the minority on this decision, which clearly disagrees."

smaller footprint, it would result in less impervious coverage on the property and less encroachment into the buffer. The [appellants] offered no probative evidence on this point.[5]9 Since the County Code permits residential structures in the R2 district up to 35 feet or 2.5 stories tall, the [appellants] could construct a dwelling comprising 2,500 square feet over two stories with a footprint of 1,250 square feet (a decrease of more than 25%). . . .

The tidal waters of the Chesapeake Bay and its tributaries (and required buffer thereto) and steep slopes heavily impact this property. With such environmentally sensitive properties, the State *and* County regulations require that the variance be the absolute *minimum necessary* to grant relief and avoid an unreasonable hardship.

\* \* \*

To obtain a variance (and, therefore, develop at all), the applicant must prove that the request is the minimum—not simply less than would be permitted on lots not impacted by the environmental factors, such as the largest house in this immediate neighborhood. The [appellants] seem to rely on several large homes in the neighborhood as evidence of the "minimal" nature of their request. We find that the existence of larger homes (in this case up to 9,000+ square feet) is not probative on this point. . . . The evidence from the applicant was simply not satisfactory to this Board to require the conclusion that the proposal meets the minimum requirement. As a reminder, minimum means e.g. "of, consisting of, or representing the lowest possible amount or degree permissible or attainable. . . ."

The [appellants] contend that the proposed home represents a modest request; however, the request must be the minimum necessary in order to meet the Code standard. Also,

9. "The Petitioners noted that one of the property owners has Lyme disease, which impacts her health. However, the variance standards require that the focus must be on the physical characteristics of the land—not the physical characteristics of the humans that *might* inhabit the land."

what may be a modest home on property without restrictions becomes an overwhelming proposition for this narrow, waterfront property with steep slopes and known to be inundated with water. The [appellants'] failure to adequately address this issue, results in the burden of proof not being met.

We specifically reject any argument that this Board should determine the minimum variance necessary to afford relief to this or any other applicant. It is not the burden of this Board to determine what variance would be the minimum necessary to afford relief to an applicant. The State law places this burden of proof and persuasion firmly on the shoulders of an applicant for a variance. *See,* Maryland Annotated Code, Natural Resources Article, Section 8–1808(d)(3).

The revised State law *requires the Board to presume* that the requested development does not conform to the general purpose and intent of the Critical Area Program. This presumption is a difficult burden to overcome. The [appellants] failed to present adequate testimony to convince the Board that the grant of the variance would be in harmony with the general spirit and intent of the Critical Area Program. *See,* [Code], Section 2–107(b)(5)(ii). The site plan and testimony reveal ... a house with a minimum square footage of 2,500 ... and a 22 by 22 foot garage, a parking pad, and two decks on site. The justification for the amount of disturbance was simply that this amount would permit the [appellants] to construct the desired dwelling unit. However, this property is heavily impacted by environmental constraints that have been protected under both State and County regulations. Neither the land nor the impacting legislation require the construction of a 2,500 square foot house with two decks and a two-car garage. The [appellants] merely want these things.

The comment letter from the Critical Area Commission provided a general statement of no objection, but failed to provide any evidence that was significant to this Board. The Board finds that the variance would adversely affect

water quality and adversely impact fish, wildlife or plant habitat within the Critical Area through the large amount of impact to this site. *See, id.,* Section 2–107(b)(5)(i). Again, it is the applicant's burden of proof to show that these points have been met. Here, the [appellants] have simply failed to meet their burden.

The [appellants] would also not be denied a right commonly enjoyed by others in the Critical Area if the variance requested were denied. *See, id.,* Section 2–107(b)(2). Others do not have the right to construct a 3,000+ square foot structure and related facilities within the buffer and with related facilities within steep slopes when there is no need for such a heavy impact. Similarly, the grant of such a large variance to permit the home the [appellants] desire would confer a special privilege on this applicant. *See, id.,* Section 2–107(b)(3). The request must be minimized to avoid conferring a special privilege.

We conclude that the proposed construction would substantially impair the appropriate use of development of the neighboring property. *See, id.,* Section 2–107(c)(2)(ii). This construction would greatly impact this property and the environment. The amount of development of this site has not been minimized. Without more evidence, we conclude that the use or development of adjoining parcels could be impaired by the grant of the variance.

Similarly, the [appellants] failed to provide adequate evidence that the granting of the requested variance would not be detrimental to the public's welfare. *See, id.,* Section 2–107(c)(2)(iv). As discussed in this opinion, the Board has serious concerns regarding the impacts of the requested variance on the Critical Area, adjacent properties and the public at large. The [appellants] have not sought to minimize this variance request. The [appellants] have also failed to show that the Critical Area will not be unnecessarily impacted and that the water quality, fish, wildlife or plant habitat will not be impacted by this variance. This case is simply one of insufficient proof to show that the [appellants] have met their burden of proof. Since the [appellants]

failed to convince the Board on these points, the request must be denied.

To reiterate, it is the burden of an applicant to prove that they met each and every one of the variance criteria. The failure to meet just one of those criteria requires that this Board deny the requested variance. The General Assembly has made abundantly clear, time and time again, that the Critical Area must be protected and that requests for variances have a very high standard of proof. . . .

We shall supplement our discussion with additional facts as necessary.

### Contentions

Appellants contend that the Board:

1) applied an incorrect and illegal standard in requiring appellants to prove that the requested variances were the "absolute minimum necessary;"

2) failed to make reasonable accommodations for Mrs. Becker's physical disability;

3) erred in ignoring the overwhelming evidence presented by appellants in favor of the variances and interjecting its own subjective views of appellants' proposal into its decision;

4) ignored the substantial evidence supporting each of the variance criteria rendering its decision arbitrary and capricious; and,

5) erred in "taking" appellants' property without just compensation.

The County supports appellants' contentions except for the last one, with which it disagrees. The County also contends the Board erred in applying the wrong law.

The individual appellees, who opposed the variance applications, support the Board's decision.

### Discussion

#### 1. *Applicable Law*

##### A. *State Law*

Before we address the merits of appellants' contentions, we shall address the County's contention that the Board applied inapplicable law. The County asserts that the Board incorrectly applied a presumption that the requested use did not conform to the purpose and intent of the Critical Area Program because, while that presumption was added to the State law in 2004, it was not added to the Code until May 12, 2005. Further, the County argues that the Board incorrectly stated that appellants had to satisfy each of the 12 variance criteria, as opposed to considering them as a package, pursuant to *Lewis v. Dep't of Natural Res.*, 377 Md. 382, 833 A.2d 563 (2003). We disagree and shall explain.

The State Critical Area Program provides that its purpose is to establish a resource protection program for the Chesapeake and Atlantic Coastal Bays and their tributaries. Maryland Code (2000 Repl.Vol. & Supps. 2002–2006), § 8–1801(b)(1) of the Natural Resources Article ("N.R."). The program was implemented "on a cooperative basis between the State and affected local governments, with local governments establishing and implementing their programs in a consistent and uniform manner subject to State criteria and oversight." N.R. § 1–1801(b)(2).

When the State Critical Area Program was adopted, a local jurisdiction could choose whether to adopt a local program. If it did not, the State Critical Area Commission was directed to adopt a program for that jurisdiction. In either event, the program had to comply with the criteria in N.R. § 8–1808. *See* N.R. §§ 8–1809 and 8–1810. Section 8–1808(d) sets forth the requirements for granting a variance from the critical area requirements. Those requirements include a finding that a failure to grant a variance would result in unwarranted hardship to the applicant. Prior to 2002, the Court of Appeals decided *Belvoir Farms Homeowners Ass'n, Inc. v. North*, 355

Md. 259, 734 A.2d 227 (1999) (holding that the "unwarranted hardship" standard was less restrictive than the constitutional taking standard and meant the denial of the reasonable and significant use of the property); *White v. North,* 356 Md. 31, 736 A.2d 1072 (1999) (holding that the determination of unwarranted hardship was the determinative factor in granting a variance and all other factors constituted guidance and could not be construed individually); and *Mastandrea v. North,* 361 Md. 107, 760 A.2d 677 (2000) (holding that the Board did not have to consider whether denying the variance would have denied reasonable and significant use of the entire lot, but rather whether denying the variance would have denied reasonable and significant use of the buffer).

In 2002, the General Assembly amended the State law, *see* 2002 Laws of Maryland, chapters 431 and 432, by enacting the substance of Senate Bill 326 and House Bill 528, effective June 1, 2002. The amendments were to "be construed to apply only prospectively and may not be applied or interpreted to have any effect on or application to any variance application for which a petition for judicial review of a decision to grant or deny a variance under a local critical area program was filed before the effective date" of the Act. N.R. § 8–1808(c) sets forth the requirements for the programs adopted by local jurisdictions. Subsection (c)(xiii) provided that a program had to include provisions for granting a variance in accordance with regulations adopted by the Critical Area Commission, as set forth in COMAR 27.01.11,[10] and subsection (d). The amendments to subsection (d) provided that, (1) in order to grant a variance, the Board had to find that the applicant had satisfied *each one* of the variance provisions, and (2) in order to grant a variance, the Board had to find that, without a variance, the applicant would be deprived of a use permitted to others in accordance with the provisions in the critical area program. The amendment did not change the definition of "unwarranted hardship" as defined by *Belvoir Farms, White,* and *Mastan-*

---

**10.** COMAR 27.01.11 sets forth the requirements for granting a variance.

*drea,* but it added a requirement that in considering an application for a variance, the Board should consider the reasonable use of the *entire parcel or lot* for which the variance is requested. The preambles to the bills expressly stated that it was the intent of the General Assembly to overrule recent decisions of the Court of Appeals, in which the Court had ruled that, (1) when determining if the denial of a variance would deny an applicant rights commonly enjoyed by others in the critical area, a board may compare it to uses or development that predated the critical area program; (2) an applicant for a variance may generally satisfy variance standards rather than satisfy all standards; and, (3) a board could grant a variance if the critical area program would deny development on a specific portion of the applicant's property rather than considering the parcel as a whole.

In 2003, the Court of Appeals decided *Lewis, supra. Lewis* was decided under the law as it existed prior to the 2002 amendments, *see* 377 Md. at 418, 833 A.2d 563, and held, *inter alia,* that (1) with respect to variances in buffer areas, the correct standard was not whether the property owner retained reasonable and significant use of the property outside of the buffer, but whether he or she was being denied reasonable use within the buffer, and (2) that the unwarranted hardship factor was the determinative consideration and the other factors merely provided the board with guidance. *Id.* at 419–23, 833 A.2d 563.

Notwithstanding the fact that the Court of Appeals expressly stated that *Lewis* was decided under the law as it existed prior to the 2002 amendments, in 2004 Laws of Maryland, chapter 526, the General Assembly again amended State law by enacting the substance of Senate Bill 694 and House Bill 1009. The General Assembly expressly stated that its intent in amending the law was to overrule *Lewis* and reestablish the understanding of unwarranted hardship that existed before being "weakened by the Court of Appeals." In the preambles, the General Assembly recited the history of the 2002 amendments and the *Lewis* decision. The amendment changed the definition of unwarranted hardship to mean that, "without a

variance, an applicant would be denied reasonable and significant use of the entire parcel or lot for which the variance is requested." The amendment also created a presumption that the use for which the variance was being requested was not in conformity with the purpose and intent of the Critical Area Program. *See* § 8–1808(d)(2)(i). The amendment became effective June 1, 2004. The effective date provision simply stated that the law took effect on that date, without further comment as to its prospective or retrospective application.

### B. *County Code*

Prior to May, 2005, the County critical area law appeared in Article 28, §§ 1A–102 to 1A–112. Article 3 contained provisions applicable to the Board, including § 2–107,[11] governing variances. In the case sub judice, the County asserts that it did not adopt the State created presumption, as outlined above, until May, 2005.[12] That is not correct. In fact, the County Council approved Bill 65–04, which was subsequently enacted on October 25, 2004. *See* 2004 Laws of Anne Arundel County. The ordinance, *inter alia,* amended § 2–107(b) to provide: (1) unwarranted hardship is as defined in N.R. § 8–1808(d)(1), i.e., applies to the entire parcel, (2) a literal interpretation of the law will not deprive an applicant of rights commonly enjoyed by others as permitted in accordance with the provisions of the Critical Area Program within the critical area, and (3) adopted the presumption contained in N.R. § 8–1808(d)(2), i.e, the presumption that the development activity for which a variance is required does not conform with the general purpose and intent of the Critical Area Program. The ordinance became effective 45 days after its enactment, on or about December 9, 2004. As a consequence, as of December 9, 2004, the County had expressly incorporated the 2002 and 2004 amendments to the State law, with possibly one exception, as we shall discuss below.

---

**11.** § 2–107 *now appears in Article 3, § 1–207.*

**12.** County's Brief, footnote 5.

In this case, appellants filed their variance applications in 2003. As stated previously, the Board conducted *de novo* proceedings on April 28 and September 1, 2004. The Board issued its decision on August 17, 2005.

The County points to § 18–2–101(b), contained in the current County Code. That section provides that Article 18, i.e., the zoning article formerly found in Article 28, "applies to all pending and future proceedings ... except that: (1) an application for a special exception or variance filed on or before April 4, 2005 shall be governed by the law as it existed prior to May 12, 2005 for the special exception or variance as approved...."

To the extent the County understands this to mean that all of the provisions of the 1985 Code, excluding amendments effective prior to May 12, 2005, apply to proceedings on applications for variances filed before April 4, 2005, we disagree. We read § 18–2–101(b) to mean that the law in existence as of May 11, 2005 governs applications filed on or before April 4, 2005. Contrary to the County's assertion, although the County Code was not amended immediately after the State amended the law in 2002 and 2004, the substantive changes in the State law were expressly incorporated into the County code prior to May 12, 2005, again with possibly one exception.

## C. *Prospective versus retrospective application*

Generally, absent an express statement to the contrary by an enacting legislative body, changes to both State and County land use laws, affecting the status of property, apply to matters that are pending and not yet decided by the agency responsible for de novo decision making. *See Holland v. Woodhaven Bldg. & Development, Inc.*, 113 Md.App. 274, 687 A.2d 699 (1996). In *Holland*, we reviewed the principles applicable to determining whether a change in the law operates prospectively only and, if not, to what extent it operates retroactively. *Id.* at 282–88, 687 A.2d 699. The use of the terms prospective and retroactive, standing alone, may be confusing because, as applied, a change in the law may have

an effect that could be described as either or both. Ultimately, the application of a change is a question of legislative intention subject to the requirements of procedural due process and noninterference with vested rights. *Id.*

■ In this case, the legislative history makes it clear that the General Assembly's desire was for the changes in the State law to take effect as soon as possible. Except for the 2002 amendment to the State statute—which expressly prevented application to matters pending judicial review—not to matters pending before Boards—there was no express provision in either the 2002 or 2004 amendments which would make a change in the law inapplicable to pending proceedings. All of the changes in the State law in this case affected the requirements for obtaining a variance, thereby affecting the zoning status of property located within the critical area. The changes did not regulate conduct or affect events that had occurred prior to effective dates and which had caused rights to accrue. *See, e.g., Washington Suburban Sanitary Commission v. Riverdale Heights Volunteer Fire Co., Inc., et al.,* 308 Md. 556, 520 A.2d 1319, (1987). Nor does this case present a situation in which a decision was made based on existing law, and the question is whether a change in the law affected that decision. This is because, as stated above, the Board's proceedings were *de novo.* Thus, each change applied to pending proceedings as of its effective date, *see, e.g., Powell v. Calvert County,* 137 Md.App. 425, 768 A.2d 750 (2001), *rev'd,* 368 Md. 400, 795 A.2d 96 (2002), and all of the changes to the critical area laws were effective prior to the Board's decision in 2005. Additionally, appellants had acquired no vested rights. *See id.*

## D. *Preemption*

With respect to the exception in the 2004 amendment to the County Code, mentioned above, one of the amendments to the State law was to expressly state that an applicant had to fulfill all of the criteria for a variance. For reasons that are unclear, the County did not expressly amend its law, even as part of the May, 2005 Code, to state that an applicant had to meet all of the criteria in Code § 2–107.

■ To provide a context for further discussion of the possible exception, we shall review general principles of pre-emption. There are three types of preemption: express, implied and by conflict. *Talbot County v. Skipper,* 329 Md. 481, 487–88, 620 A.2d 880 (1993). Clearly, the first two do not apply here. Rather than preempting the field, the General Assembly has done the opposite—created a cooperative system. *See* N.R. § 8–1808. Nevertheless, a charter county such as Anne Arundel county, whether empowered under Md. Const., Article 25A, § 5—the "Express Powers Act"—and/or, as here, under a specific statute, may not enact laws that conflict with the State law. *See Skipper,* 329 Md. at 487 n. 4, 620 A.2d 880 (stating that a "local ordinance is pre-empted by conflict when it prohibits an activity which is intended to be permitted by state law, or permits an activity which is intended to be prohibited by state law."); *Belvoir Farms,* 355 Md. at 273, 734 A.2d 227 (stating that the "Express Powers Act, generally bestows upon a county, as to those enumerated powers, the same powers in respect to local laws, as the State would otherwise have, provided that the county's enactments do not conflict with public general laws."); *Holmes v. Maryland Reclamation Associates,* 90 Md.App. 120, 142, 600 A.2d 864 (1992) (stating that "counties are subject to the legislature's control, and where legislation conflicts with local law, the state law prevails."). N.R. § 8–1801(b)(2) provides that the State criteria are mandatory, and local programs are subject to them. Thus, the criteria contained in § 8–1808, including the criteria for granting a variance, are mandatory.

■ The only question, therefore, is when—not if—a county program, that is not in compliance with the State criteria, is invalidated. The noncompliance can occur, either by enacting a provision inconsistent with the State criteria, or by failing to enact a provision required by the State criteria. Section 8–1809(g) provides that local jurisdictions are required to review and propose amendments to their programs at least every six years. Section 8–1808(*l*) provides that, if a local program conflicts with the State law, the Critical Area Commission may notify the jurisdiction of the deficiency, and

within ninety days, the jurisdiction is required to submit a proposed change to correct the deficiency. The above sections, and § 8–1810 as well, are directed at programs as a whole, including local maps. There is no express direction in the State law with respect to the applicability of amendments to the mandatory criteria in § 8–1808, and when such amendments are effective in each jurisdiction subject to the State Critical Area Program. Given the General Assembly's express goals, which include uniformity, it is unlikely that it intended to permit a jurisdiction to ignore changes in the mandatory requirements for up to six years, the length of time between mandatory reviews. *See, cf., Worton Creek Marina, LLC v. Claggett,* 381 Md. 499, 850 A.2d 1169 (2004).

We need not decide that issue directly, however, because the language in the County Code, as of the end of 2004, was consistent with the State criteria, to the extent that it expressly adopted it, and with respect to the one exception, i.e., no express statement that an applicant had to meet all of the criteria in Code § 2–107, the Code was not expressly inconsistent with the State criteria. The Board interpreted the Code as requiring compliance with all of the criteria, and thus, it interpreted it as being consistent with the State law.

Accordingly, the Board applied the correct law.

### 2. *Standard of Review*

#### *Substantial evidence*

 Administrative agency decisions are not set aside unless the decision is arbitrary, illegal or capricious. *Mortimer v. Howard Research & Dev. Corp.,* 83 Md.App. 432, 441, 575 A.2d 750 (1990). In determining whether a decision is arbitrary, illegal or capricious, a reviewing court must decide whether the question before the agency was fairly debatable. *Id.* An issue is fairly debatable if reasonable minds could have reached a different conclusion on the evidence, and if the conclusion is supported by substantial evidence in the record. *Stansbury v. Jones,* 372 Md. 172, 182–83, 812 A.2d 312 (2002); *see Howard County v. Dorsey,* 45 Md.App. 692, 701, 416 A.2d

23 (1980) ("The 'fairly debatable' test is analogous to the 'clearly erroneous' standard commonly applied under [Rule 8-131(c) ]. A court must consider all of the evidence before the zoning authority; the decision is 'fairly debatable' if it is supported by substantial evidence on the record taken as a whole.") (other citations omitted); *Bd. of County Comm'rs for Cecil County v. Holbrook,* 314 Md. 210, 218, 550 A.2d 664 (1988) (stating that if the issue is fairly debatable, the matter is one for the Board's judgment and should not be second-guessed by an appellate court.). "In regards to findings of fact, the court cannot substitute its judgment for that of the agency and must accept the agency's conclusions if they are based on substantial evidence and if reasoning minds could reach the same conclusion based on the record; when reviewing findings of law, however, no such deference is given the agency's conclusions." *Layton v. Howard County Bd. of Appeals,* 171 Md.App. 137, 173–74, 908 A.2d 724 (2006) *(quoting Hayfields, Inc. v. Valleys Planning Council, Inc.,* 122 Md.App. 616, 629, 716 A.2d 311 (1998)) (other citations omitted). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Snowden v. City of Baltimore,* 224 Md. 443, 448, 168 A.2d 390 (1961). The "resolution of conflicts in the evidence is left to the agency and, where inconsistent inferences may be drawn, the agency is left to draw the inference." *Layton,* 171 Md.App. at 174, 908 A.2d 724 *(citing Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 513, 390 A.2d 1119 (1978)). The test for reviewing the inferences drawn is reasonableness, not rightness. *Snowden,* 224 Md. at 448, 168 A.2d 390.

 On the other hand, a reviewing court may not uphold an agency's decision if a record of the facts on which the agency acted or a statement of reasons for its action is lacking. *Mortimer,* 83 Md.App. at 441, 575 A.2d 750 *(citing Board of County Comm'rs for Prince George's County v. Ziegler,* 244 Md. 224, 229, 223 A.2d 255 (1966)). Without this reasoned analysis, a reviewing court cannot determine the basis of the agency's action. *Mortimer,* 83 Md.App. at 441,

575 A.2d 750. If the agency fails to meet this requirement, the agency's decision may be deemed arbitrary. *Id.* (citation omitted). "Findings of fact must be meaningful and cannot simply repeat statutory criteria, broad conclusory statements, or boilerplate resolutions." *Bucktail, L.L.C. v. County Council of Talbot County,* 352 Md. 530, 553, 723 A.2d 440 (1999).

### 3. *The Present Case*

#### A. *The Board's Findings*

##### i. Standards for granting or denying variances

As pointed out by the County, there are different criteria that must be met for "ordinary" or "general" zoning variances and critical area variances. Article 3, § 2–107 of the 1985 Code, applicable at the time of the denials of appellants' variance requests, and which is now found in Article 3, § 1–207, without substantial change, governs the granting or denying of both types of variances by the Board.

Article 3, § 2–107, entitled "Standards for granting variance," provided, in part:

(a) The County Board of Appeals may vary or modify the provisions of Article 28 of this Code when it is alleged that *practical difficulties or unnecessary hardships* prevent carrying out the strict letter of that article, provided the spirit of law shall be observed.... A variance may be granted only after determining:

(1) that because of certain unique physical conditions, such as irregularity, narrowness, or shallowness of lot size and shape, or exceptional topographical conditions peculiar to and inherent in the particular lot, there is no reasonable possibility of developing the lot in strict conformance with this article; or

(2) that because of exceptional circumstances other than financial considerations, *the grant of a variance is necessary to avoid practical difficulties or unnecessary hardship,* and to enable the applicant to develop such lot.

(b) *For a property located in the critical area,* a variance to the requirements of the County critical area program may be granted after determining that:

(1) due to the features of a site or other circumstances other than financial considerations, strict implementation of the County's critical area program would result in an *unwarranted hardship* to the applicant;

(2) a literal interpretation of [COMAR 27.01] or the County critical area program and related ordinances will deprive the applicant of rights commonly enjoyed by other properties in similar areas within the critical area of the County;

\* \* \*

(4) the variance request:

(i) is not based on conditions or circumstances that are the result of actions by the applicant; and

(ii) does not arise from any condition relating to land or building use, either permitted or non-conforming, on any neighboring property; and

(5) the granting of the variance:

(i) will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat within the County's critical area; and

(ii) will be in harmony with the general spirit and intent of the County critical area program.

(c) A variance may not be granted under subsection (a) or (b) of this section unless the Board finds that:

(1) the variance is the minimum variance necessary to afford relief;

(2) the granting of the variance will not:

(i) alter the essential character of the neighborhood or district in which the lot is located;

(ii) substantially impair the appropriate use or development of adjacent property;

(iii) be contrary to acceptable clearing and replanting practices required for development in the critical area; or

(iv) be detrimental to the public welfare.

(emphasis added).

Subsections (a) and (c) relate to general zoning variances, and subsections (b) and (c) relate to critical area variances. The amendments to the County Code, effective in December, 2004, have to be engrafted on these provisions.

 As previously mentioned, appellants requested 3 variances: (1) from art. 28, 1A–104 (a)(1), the 100–foot buffer requirement; from art. 28, 1A–105 (c), which prohibits development on steep slopes; and, (3) from art. 28, 2–405(a)(3), the 25–foot rear yard setback requirement. The variance request relating to the buffer was for the house and connection of the septic system. The variance request for the steep slopes was for the septic system. Both of these requests were for variances from the stringent critical area law. The request for a variance from the setback, however, is a request under the more lenient general zoning requirements. As indicated above, the criteria for a general zoning variance and the criteria for a critical area variance are not the same. In denying appellants' requests, however, the Board made no distinction between the two.

The County argues that by failing to differentiate between the setback variance and the critical area variances, and failing to make separate findings as to each variance, the Board "leaves the applicant to guess at what variance proposals . . . might eventually meet with Board approval."

We agree that the Board should have distinguished between the critical area variance and the setback variance, even though, because Parcel 2 was located 97% within the 100–foot critical area buffer, appellants would not be able to build without both the critical area variances and the setback variance. A meaningful Board explanation is especially important when, as here, a house can be legally built on the property in question, but not without variances, and a potential constitutional taking is a serious concern. Separate findings by the

Board, and explanation of those findings, will facilitate meaningful judicial review and/or advise appellants of the basis for the Board's decision so they can make an informed decision as to future action.

Aside from the above, appellants and the County argue that the Board's decision was not supported by substantial evidence and its findings were otherwise inadequate. Appellants aver that the Board "either failed to make factual findings or ignored the overwhelming evidence in the record relating to the remaining factors in rendering its decision."

We reiterate that appellants had the burden of meeting all of the requirements contained in § 2–107(b) and (c) as to the critical area variances, and they faced a presumption, i.e., the presumption that the development activity for which a variance is required did not conform to the general purpose and intent of the Critical area Program. Appellants had the burden of production and the burden of persuasion to overcome the presumption. *See* § 8–1808(d)(3)(1).

As stated and outlined above, § 2–107(b) and (c), as amended, set forth the criteria that must be met in order to obtain a variance from the critical area zoning regulations. In denying appellants' requests, the Board found that appellants had in fact met their burden of proof with respect to § 2–107(b)(4)(i) (that the hardship was not self-created); (b)(4)(ii) (not caused by a condition on neighboring property); and (c)(2)(i) (it would not alter the essential character of the neighborhood). The Board further found, however, that appellants would not be deprived of rights commonly enjoyed by others pursuant to (b)(2); that appellants would be granted a special privilege pursuant to (b)(3); that the variance would affect water quality, fish, wildlife and habitat pursuant to (b)(5)(i); that appellants had not met their burden of showing that the variance was in harmony with the spirit and intent of the County program pursuant to (b)(5)(ii); that the variance would substantially impair the use or development of adjacent properties pursuant to (c)(2)(ii); and that appellants had not met

their burden of showing that it would not be detrimental to the public welfare pursuant to (c)(2)(iv).

 We note that we can find no evidence or reasonable inferences to be drawn from the evidence to support certain of the Board's conclusions. Specifically, we did not see evidence of an adverse impact on water quality, or that the use would impair the use or development of the adjacent property. In fact, the adjacent properties are already developed. Furthermore, the Board did not make a specific finding regarding § 2–107(b)(1), i.e., regarding the specific topographical features of the property. That said, however, it was appellants' burden to present evidence and overcome the presumption as to *all* of the requirements.

### ii. Minimum necessary

The Board's ultimate conclusion was that appellants had not met their burden of showing that the request was the minimum necessary to afford relief. Appellants argue that the Board applied an incorrect standard in applying an "absolute minimum necessary" as opposed to a "minimum necessary" standard and that the evidence did not support the Board's finding. Furthermore, appellants and the County argue that the Board did not take into account Mrs. Becker's disability.

We note that the Board did use the word absolute at one point in its opinion, but in context it seems clear that the Board knew the correct standard. On remand, we are confident the Board will articulate and apply the correct standard.

There was evidence that appellants' proposed house was not the smallest or the largest in the area, but was closer to the smallest. There was some evidence acknowledging that the configuration of the house could be changed, which would result in a lesser impact. For instance, on cross-examination, Paul Miller stated that if the house was made smaller, there would be less of an impact on the critical areas and less of a variance would be required. Thomas Brown stated that the house could be built with a parking pad in lieu of a garage, and the breakfast area and kitchen could be smaller. He also

stated that if the house was elongated or if more square feet were devoted to the second story, appellants would require less of a variance.

The question of whether the variances were the minimum necessary must be considered, however, in the context of the purpose of the proposed construction, recognizing that appellants are entitled to build some type of reasonable structure. There was no finding by the Board as to appellants' reasonable needs, or reference to evidence, and why the proposed structure was not the minimum necessary to meet those needs.[13] On remand, the Board must provide an explanation.

Appellants complain that the Board "failed to consider Mrs. Becker's physical disability and failed to grant any accommodation as required by the law based on her physical limitations." Mr. Becker testified that his wife has chronic Lyme disease and that they wanted to build a home with handicap access. Our review of the record did not reveal any evidence of an existing disability, however, or any evidence as to Mrs. Becker's future health needs, other than the implication that she would require handicap access. Mr. Becker also stated that he and Mrs. Becker did not like the home in which they were currently living. There was also evidence that Mrs. Becker had engaged in clearing bushes from the property.

The Board, in a footnote, acknowledged that Mrs. Becker has Lymes's Disease, "which impacts her health." The Board stated, however, that the variance standards focus on "the physical characteristics of the land-not the physical characteristics of the humans that *might* inhabit the land." (emphasis in original).

On remand, in determining whether appellants' proposal met the variance criteria and, specifically, whether appellants would be denied reasonable and significant use of the entire Parcel 2, the Board must consider appellants' likely disability, if any, and make appropriate findings. *See Mastandrea v. North,* 361 Md. 107, 136, 760 A.2d 677 (2000).

---

13. The Board made no credibility findings adverse to appellants.

### B. *"Taking" Without Just Compensation*

An unconstitutional "taking" of property is generally proved when a "regulation deprives a property owner of all economically beneficial or productive use of land." *Belvoir Farms*, 355 Md. at 282, 734 A.2d 227 *(citing Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). Appellants argue that without the variances, the property cannot be developed for residential construction suitable to their needs. The Board's decision, however, does not preclude all economically beneficial or productive use of the land. Rather, the Board concluded that appellants' specific variance requests did not satisfy the applicable criteria and, based on the evidence, with adequate findings as to appellants' needs and adequate explanation as to how they can be met, a denial could be upheld.

At some point, however, assuming new and different variance requests in the future, a denial of variances would effect an unconstitutional taking. Under the circumstances of this case, the Board's opinion is deficient, and we shall direct that the matter be remanded to the Board. On remand, the Board may receive additional evidence, if offered by any or all of the parties. The Board must provide a statement of reasons for its decision that go beyond repeating the words in the Code, and which include references to the evidence, so as to enable the parties to make reasonable decisions, if the variance requests are denied, and to permit meaningful judicial review, if that is requested.

A statement by the Board that it is not persuaded that the minimum necessary standard has been met is not a statement as to why it has not been met, with reference to the evidence. The situation before us is not one in which an administrative body has discretion to perform or not perform some act. In that situation, depending on the circumstances, a failure to be persuaded by the party having the burden of persuasion may be a sufficient explanation by the agency for its failure to act. In this case, the Board has an obligation to grant or deny variance requests. If an applicant establishes compliance with

the applicable criteria, that applicant is entitled to the variance. The Board has the obligation to determine compliance, but the result is not discretionary; the result flows from the determination. Thus, whether it grants or denies the requested variance, the Board has an obligation to explain its decision.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY WITH DIRECTIONS TO VACATE THE DECISION OF THE BOARD AND TO REMAND THE MATTER TO THE BOARD FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID FIFTY PERCENT BY APPELLANTS AND FIFTY PERCENT BY THE INDIVIDUAL APPELLEES.**