991 A.2d 138

**CRITICAL AREA COMMISSION FOR the CHESAPEAKE AND ATLANTIC COASTAL BAYS, et al.**

v.

**MORELAND, LLC, et al.**

No. 00823 Sept.Term, 2008.

Court of Special Appeals of Maryland.

March 25, 2010.

262

Jon A. Mueller and Saundra K. Canedo (Marianne E. Dise, Douglas F. Gansler, Atty. Gen., on the brief), Annapolis, Md., for Appellants.

David M. Plott (Linowes & Blocher, LLP, on the brief), Annapolis, MD, for Appellees.

Panel: SALMON,* KEHOE, and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

KEHOE, Judge.

In *Becker v. Anne Arundel County,* 174 Md.App. 114, 145, 920 A.2d 1118 (2007), this Court addressed the issue of the degree of specificity required for findings by a board of zoning appeals in granting or denying an application for variances to the buffer requirements of the State's critical area law. In this case, we will apply the teachings of *Becker* and elaborate on some of them.

The Critical Area Commission for the Chesapeake and Atlantic Coastal Bays (the "Commission") and the South River Federation ("SRF") appeal a judgment of the Circuit Court for Anne Arundel County vacating a decision of the Anne Arundel County Board of Appeals (the "Board") and remanding the case to the Board for further proceedings. The Board's decision denied an application of Moreland, LLC ("Moreland"), one of the appellees,[1] for variances from the strict application of certain provisions of the critical area provisions of the Anne Arundel County zoning ordinance. The Commission, SRF and appellees present one issue to us, which we have reworded as follows:

---

* James P. Salmon, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

1. Moreland's application involved two adjacent lots. While this matter was pending, one of the lots was acquired by Anthony T. and Barbara J. Grimaldi. We will refer to Moreland and Mr. and Mrs. Grimaldi as "appellees."

Was the decision of the Board legally sufficient to support its denial of the variance application? [2]

We will answer the question in the negative and affirm the judgment of the circuit court.

## I. Background

### A. The Critical Area Law

Maryland's Critical Area Act (the "Act"), now codified as MD. CODE, NAT. RES. § 8–1801 through 8–1817 (2000, 2007 Repl.Vol., 2009 Supp.) (hereafter "NR,") was enacted by the General Assembly in 1984 in reaction to the widely recognized and alarming degradation of unique natural resources associated with the Chesapeake Bay and its tributaries resulting from a variety of human activities. The Act authorized the establishment of local government resource protection programs "on a cooperative basis between the State and affected local governments, with local governments establishing and implementing their programs in a consistent and uniform manner subject to State criteria and oversight." NR § 8–1801(b)(2). The goal of each local critical area program is:

(1) To minimize adverse impacts on water quality that result from pollutants that are discharged from structures or conveyances or that have run off from surrounding lands;

(2) To conserve fish, wildlife, and plant habitat; and

(3) To establish land use policies for development in the Chesapeake Bay Critical Area … which accommodate growth and also address the fact that, even if pollution is controlled, the number, movement, and activities of persons in that area can create adverse environmental impacts.

---

**2.** The Commission presented the following question: "Is the Board of Appeals' determination, that the applicant for a Critical Area variance failed to meet its burden of satisfying all variance criteria, supported by substantial evidence and applicable law?" The SRF asked if "the Circuit Court err[ed] when it concluded that the Board's decision failed to comply with the requirements of *Becker?* " Moreland framed the issue as whether "the Circuit Court properly remand[ed] this case to the Board of Appeals for reconsideration in light of this Court's recent decision in *Becker v. Anne Arundel County?*"

NR § 8–1808(b). In order to accomplish these goals, each local government subject to the Act,[3]is required to enact, as necessary, amendments to its zoning regulations. NR § 8–1808(c)(1)(iii)(3).

The Act requires local governments to authorize the granting of variances from critical area regulations, subject to the requirements of the Act and regulations adopted by the Commission. NR § 8–1808(c)(xiii).[4] Section 8–1808(d) of the Act provides in pertinent part:

Granting of variance.—

(1) In this subsection, "unwarranted hardship" means that, without a variance, an applicant would be denied reasonable and significant use of the entire parcel or lot for which the variance is requested.

\* \* \* \*

[(2)](ii) In considering an application for a variance, a local jurisdiction shall presume that the specific development activity in the critical area that is subject to the application and for which a variance is required does not conform with the general purpose and intent of this subtitle, regulations adopted under this subtitle, and the requirements of the local jurisdiction's program.

(iii) If the variance request is based on conditions or circumstances that are the result of actions by the applicant, a local jurisdiction shall consider that fact.

(3) (i) An applicant has the burden of proof and the burden of persuasion to overcome the presumption established under paragraph (2)(ii) of this subsection.

(ii) 1. Based on competent and substantial evidence, a local jurisdiction shall make written findings as to whether

---

3. The Act applies to all local governments, with planning and zoning powers, "in which any part of the [Critical Area] . . . is located." NR 8–1802(a)(14).

4. The Commission's standards for variances are set out in COMAR 27.01.11.

the applicant has overcome the presumption established under paragraph (2)(i) of this subsection.

2. With due regard for the person's experience, technical competence, and specialized knowledge, the written findings may be based on evidence introduced and testimony presented by:

A. The applicant;

B. The local jurisdiction or any other government agency; or

C. Any other person deemed appropriate by the local jurisdiction.

(4) A variance to a local jurisdiction's critical area program may not be granted unless:

(i) Due to special features of a site, or special conditions or circumstances peculiar to the applicant's land or structure, a literal enforcement of the critical area program would result in unwarranted hardship to the applicant;

(ii) The local jurisdiction finds that the applicant has satisfied each one of the variance provisions; and

(iii) Without the variance, the applicant would be deprived of a use of land or a structure permitted to others in accordance with the provisions of the critical area program.[5]

One of the central components of every local government critical area program is the "buffer"—a naturally vegetated strip of land, generally at least 100 feet in width, to be "managed to protect aquatic, wetlands, shoreline, and terrestrial environments from man-made disturbances." NR § 8–1802(a)(4). With exceptions not relevant to this case, development activities are prohibited within the buffer.

Anne Arundel County (the "County") has adopted a critical area local program. The provisions of the County's program most relevant to this case are County Code § 17–8–301(b),

---

**5.** NR § 8–1808(d) was amended by Chapters 650 and 651, Acts 2009, effective January 1, 2010. These amendments are not pertinent to the issues raised in this appeal.

which prohibits new structures within the buffer; § 17–8–601(b), which prohibits the clearing of more than 30% of a residential lot, and § 3–1–207, which sets out the County's critical area variance procedure.[6] Section 3–1–207 is consis-

---

**6.** Anne Arundel County Code § 3–1–207 provides, in pertinent part:

(b) **Variances in the critical area or a bog protection area.** For a property located in the critical area . . ., a variance to the requirements of the County critical area program . . . may be granted only upon an affirmative written finding that:

(1) because of certain unique physical conditions, such as exceptional topographical conditions peculiar to and inherent in the particular lot, or irregularity, narrowness, or shallowness of lot size and shape, strict implementation of the County's critical area program would result in an unwarranted hardship, as that term is defined in the Natural Resources Article, § 8–1808, of the State Code, to the applicant;

(2) (i) a literal interpretation of COMAR, 27.01, Criteria for Local Critical Area Program Development, or the County critical area program and related ordinances will deprive the applicant of rights commonly enjoyed by other properties in similar areas, as permitted in accordance with the provisions of the critical area program, within the critical area; or

\* \* \* \*

(3) the granting of a variance will not confer on an applicant any special privilege that would be denied by:

(i) COMAR, 27.01, or the County critical area program to other lands or structures within the County critical area; or

\* \* \* \*

(4) that the variance request:

(i) is not based on conditions or circumstances that are the result of actions by the applicant, including the commencement of development activity before an application for a variance was filed; and

(ii) does not arise from any condition relating to land or building use on any neighboring property;

(5) that the granting of the variance:

(i) will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat within the County's critical area . . .; and

(ii) will be in harmony with the general spirit and intent of the County critical area program . . .; [and]

\* \* \* \*

(7) the applicant, by competent and substantial evidence, has overcome the presumption contained in the Natural Resources Article, § 8–1808(d)(2), of the State Code.

(c) **Required findings.** A variance may not be granted under subsection (a) or (b) unless the Board finds that:

(1) the variance is the minimum variance necessary to afford relief;

(2) the granting of the variance will not:

tent with NR 8–1808(d). *Becker,* 174 Md.App. at 133–34, 920 A.2d 1118.

## B. The Properties

In 2003, Moreland purchased two small, unimproved water-front lots [7] located on Warehouse Creek, near Edgewater, Maryland. Both lots are located within the R1–Residential zoning district, which permits single family uses. The properties are also within Anne Arundel County's critical area overlay district and have a LDA (limited development area) classification. When the lots were created in 1919, each comprised about one acre but, in the intervening years, erosion has significantly reduced each lot's area. Site 1 now comprises approximately 35,414 square feet, most of which is within the buffer. Site 2 contains 26,408 square feet of land, all within the buffer. Portions of both lots are also subject to a State Highway Administration drainage easement. As the lots approach the shoreline, the land falls off, resulting in a 15% slope on Site 1 and a 25% slope on Site 2.

Moreland proposed to construct single family residences on each lot. In order to do so, it sought variances from the prohibition against structures in the buffer and the 30% clearing limit. Specifically, Moreland proposed a house, garage and driveway on Site 1 totaling 4,961 square feet of impervious surface. At its closest point, the house would be 51 feet from the shoreline; Moreland accordingly requested a 49 foot variance to the 100–foot buffer. Moreland also requested a variance to clear 41% of the parcel. On Site 2,

---

(i) alter the essential character of the neighborhood or district in which the lot is located;

(ii) substantially impair the appropriate use or development of adjacent property;

(iii) reduce forest cover in the limited and resource conservation areas of the critical area;

(iv) be contrary to acceptable clearing and replanting practices required for development in the critical area . . .; or

(v) be detrimental to the public welfare.

**7.** Before the Board, the parties referred to the parcels as "Site 1" and "Site 2." For consistency's sake, we will do the same.

Moreland proposed a residence, garage and driveway totaling 2,457 square feet of impervious surface. The proposed house would be 66 feet from the shoreline, thus requiring a variance of 34 feet to the 100 foot buffer. Moreland sought permission to clear 34% of Site 2.

Moreland's application was denied by the Anne Arundel County administrative hearing officer on February 13, 2006. Moreland appealed the denial to the Board, which held a *de novo* hearing extending over three evening sessions commencing on August 16, 2006, and concluding on December 6, 2006.

### C. The Board's Hearing

The Act makes it explicit that an applicant for a variance bears both the burden of production and persuasion with regard to all evidentiary issues associated with the application. NR 8–1808(d)(3)(1). As we will see, although the Board denied the application, it did not find that Moreland had failed to meet its burden of production. Neither appellant makes such a contention to this Court. In light of this, we will abbreviate the customary detailed description of the evidence presented to the Board and instead provide a summary of the testimony to give the reader a sense of the often sharply conflicting evidence adduced at the hearing.

Michael Baldwin, Moreland's owner, testified that similar variances had been granted for a property on Lot 1's eastern side. In addition, he testified generally about the project and presented the Board with letters from the immediately neighboring property owners stating that they did not oppose Moreland's proposal.

Terry Schuman, a civil engineer and site planner retained by Moreland, testified regarding the zoning of the lots, their history, the surrounding neighborhood and the details of Moreland's development proposal. The houses would be served by private wells and private septic systems. Schuman testified that the project would comply with applicable State and County storm water management (SWM) requirements and that, if properly implemented and maintained, the SWM

system on the properties would protect water quality. Rain barrels at all roof drains and "green roofs"[8] for screened in porches had also been proposed in order to provide additional SWM.

Debra Schwab, Moreland's expert in landscape architecture design and environmental design, testified that each house's location was planned to reduce the impact to the environment. She added that the requested variances would not have an adverse effect on wildlife or bird habitats within the critical area. Ms. Schwab further testified that, after the lots were developed, there would be a net increase in leaf and forest cover on the properties. She had also designed four or five other green roofs in the area in order to manage storm water runoff quality and slow water's concentration. Schwab also testified that the details of the storm water management plan had not been fully designed.

Catherine Purple Cherry, an architect and land planner, testified that she designed the proposed houses' footprints and assisted in designing the location of the septic system. She testified that the proposed houses were consistent in size and design with houses in the neighborhood.

John Flood, an environmental consultant, was accepted by the Board as an expert witness in "aquatic resources ... and land use and its effect on aquatic resources." Mr. Flood testified that the proposed residences would have a negative effect upon water quality in Warehouse Creek. We will discuss Mr. Flood's testimony in greater detail later.

Andrew Koslow,[9] the South River Keeper,[10] testified as to

---

8. Green roofs
 are rooftops planted with vegetation. Intensive green roofs have thick layers of soil (6 to 12 inches or more) that can support a broad variety of plant or even tree species. Extensive roofs are simpler green roofs with a soil layer of 6 inches or less to support turf, grass, or other ground cover.
 U.S. Environmental Protection Agency Heat Island Effect Glossary, http://www.epa.gov/heatisland/resources/glossary.htm (last visited Feb. 22, 2010).

9. The transcript reflects that Mr. Koslow was "present on behalf of [the SRF]." Although Mr. Koslow was not recognized as an attorney or as

the decline in the water quality of Warehouse Creek. He opined that the proposed houses would create significant runoff that would carry sediment and nutrients into the creek, contributing to the decline.

Lori Rhodes, the County's representative from the Office of Planning and Zoning, reported that the Development Division and the Health Department had no objection to the proposal, but that the Commission opposed it because it concluded the proposals were not the minimum necessary to afford relief.[11] As a result, the Office of Planning and Zoning did not support granting the variances.

James Gracie testified as a representative of SRF. Gracie was accepted by the Board as an environmental consultant in geophysical processes in stream and water flows on land. He testified that water flowing from the proposed impervious surfaces would create "gullies and cause erosion on the steep slopes" which, in turn, would result in adverse impacts in water quality.

Several neighboring property owners testified. Ross Voorhees said that granting the variances would confer a special privilege on Moreland because the sizes of the proposed houses are excessive for the lots and would adversely impact the creek. He stated that developing the lots would mean the clearing of mature trees and the creation of additional sediment and erosion into the creek. He also testified that a

___

an expert, the Board allowed him to cross-examine witnesses and to testify regarding the water quality in Warehouse Creek. Appellees did not contest this anomalous role.

**10.** "A River keeper is a full-time advocate for a body of water and its surrounding community." Ask An Expert!: What exactly is a Riverkeeper?, http://dnr.maryland.gov/mydnr/askanexpert/river_keeper.asp (last visited March 22, 2010).

**11.** The Commission raised two issues in its comments. First, it stated that "reductions in the footprints of the proposed dwellings would reduce the impacts to forest resources on site and the amount of impervious surface within the Critical Area Buffer." In addition, the Commission suggested relocating each proposed residence within its respective lot.

County-funded study discovered that protecting the buffer and reducing the sediment deposited in the creek as well as impervious surface area may improve the creek's water quality. Richard Maio testified that, according to an analysis he performed on information available from the Maryland State Department of Assessments and Taxation of representative houses on the north side of the creek,[12] the proposed houses were on the large side. He also stated that his property has a solid 400 foot bulkhead where runoff flows and is absorbed by the ground.

Peter Quirk, another member of the community, testified that he also performed an analysis of enclosed square footage and concluded that two-thirds of the houses on the south side of the creek are less than 2,500 square feet. Kenneth Malley and Elizabeth Del Castillo, other community members, testified that they were concerned about the adverse effects to the creek that would result from the development of the proposed lots. Finally, Fred Hunt, a community member, testified to the existence of a sandbar next to the subject properties that he claims is the direct result of a "broken promise" by the Maryland State Highway Administration (SHA). He claims that the SHA told the community members that silting would not be a problem.

On January 3, 2007, the Board issued a memorandum opinion denying the variance application. The Board concluded that Moreland "failed to meet [its] burden of proof regarding six of the variance criteria. Thus, a variance cannot be granted in this appeal."

Specifically, the Board made the following findings of fact:

The subject properties are waterfront lots located in the CA [Critical Area] and designated as LDA [Limited Development Area]. They are zoned R1–Residential. Both lots are severely constrained by steep slopes of 15% and greater, the 100 foot buffer and a "perpetual easement for stream" owned by the SHA [Maryland State Highway Administra-

---

12. The lots at issue are located on the north side of the creek.

tion]. The Petitioner has requested variances of 34 feet to the minimum 100 foot CA buffer for each lot and variances to clear more woodland than permitted by the Code. . . . Variances to the CA criteria require the Petitioner to satisfy an extensive list of requirements set out in the Code. *See id.* § 3–1–207. The requirements established for variances within the CA are exceptionally difficult to overcome. . . .

The Petitioner must first show that "because of certain unique physical conditions, such as exceptional topographical conditions peculiar to and inherent in the particular lot, or irregularity, narrowness, or shallowness of lot size and shape, strict implementation of the County's critical area program . . . would result in an unwarranted hardship." *Id.* § 3–1–207(b)(1). There is no denying that there are unique physical conditions on the subject properties. Testimony provided by the Petitioner's experts, the Protestants' experts and the County all indicated that the lots were constrained by steep slopes 15% and greater and the SHA's perpetual stream. In addition, Site # 2 is completely within the 100 foot buffer and a significant majority of Site # 1 is within the buffer. **Accordingly, we find that strict adherence to the CA program would result in an unwarranted hardship to the Petitioner.**

The Petitioner next must establish that "[a] literal interpretation of COMAR, 27.01, Criteria for Local Critical Area Program Development or the County's critical area program and related ordinances will deprive the applicant of rights commonly enjoyed by other properties in similar areas as permitted in accordance with the provisions of the critical area program within the critical area of the County." [Code] § 3–1–207(b)(2)(i). The surrounding community is completely developed with waterfront single-family dwellings. Many of the homes in the community are within the 100 foot CA buffer and measure more than 2,000 square feet in area. . . . **Therefore, we find that the Petitioner would be denied rights commonly enjoyed by others if the CA laws are applied literally.**

Next, the Petitioner must show that "[t]he granting of a variance will not confer on an applicant any special privilege that would be denied by COMAR, 27.01, the County's critical area program to other lands or structures within the County critical area...." [Code] § 3–1–207(b)(3). As we previously addressed, there are a significant number of homes in the community located inside the 100 foot CA buffer.... In addition, variances have been granted throughout the community. **Thus, we do not believe that granting the Petitioner's requested variance would give him a special privilege.**

The Petitioner also must establish that "[t]he variance request is not based on conditions or circumstances that are the result of actions by the applicant, including the commencement of development before an application for a variance was filed, and does not arise from any condition relating to land or building use on any neighboring property." *Id.* § 3–1–207(b)(4). The unique conditions of the Petitioner's property are natural conditions, inherent in the property. None of the development issues were created by the Petitioner or the conditions of neighboring property.... **Accordingly, we find that the requested variances are needed due to nature, not any acts of the petitioner or to that on neighboring property.**

The next burden that the Petitioner must overcome is to show that "[t]he granting of a variance will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat within the County's critical area or a bog protection area and will be in harmony with the general spirit and intent of the County's critical area program or bog protection program." *Id.* § 3–1–207(b)(5). The subject properties are waterfront lots located in the CA. They have steep slopes and are completely vegetated. **The proposed sizes of the houses would create additional impervious surface, which would result in an adverse impact on wildlife and the plant habitat of the lots and a significant detriment to the water quality of the creek. In addition, we are not convinced that the proposed SWM**

[storm water management plan] would provide the necessary controls needed to handle the additional impervious surfaces that the Petitioner proposes. The large amount of impervious coverage so close to the creek would reduce vegetative cover and alter the hydrology of the area. Therefore, we find that there would be an adverse affect [sic] on the various ecosystems in the area.

\* \* \* \*

The Petitioner's next burden is to establish that through "competent and substantial evidence, [they] ha[ve] overcome the presumption contained in the Natural Resources Article, § 8–1808(d)(2), of the State Code." [Code] § 3–1–207(b)(7). Under the above cited section of the Natural Resources Article it is presumed "that the specific development activity in the critical area that is subject to the application and for which a variance is required does not conform with the general purpose and intent of this subtitle, regulations adopted under the subtitle, and the requirements of the local jurisdiction's program." Md.Code Ann., Natural Resources § 8–1808(d)(2)(i). Like the other property owners in the community, the Petitioner wants to develop his property and we cannot fault him for that. **However, here the Petitioner proposes to build two houses inside the 100 foot buffer and with more clearing than permitted by the Code. Allowing the Petitioner to build the houses as proposed is not necessary to avoid denying the Petitioner a reasonable and significant use of his property. Alternative plans exist that would provide for less disturbance to the CA. Therefore, we find that the Petitioner's proposed houses fall outside the intent of the CA programs.**

Next, the Petitioner has the burden of proving that "the variance is the minimum variance necessary to afford relief." Code, § 3–1–207(c)(i). The houses proposed by the Petitioners are average in size for the community. The Petitioner made several modifications throughout the planning process in an effort to build with the least disturbance

to the CA as possible. However, we find it difficult to believe that the houses as proposed are the minimum necessary to afford the Petitioner relief. With an environmentally sensitive property such as these [sic], State and County regulations required that the variance be the absolute minimum necessary to grant relief. This minimum must protect the CA—not the Petitioner's idea of what size home they would prefer on the property. The CA Program was designed to protect the Chesapeake Bay and its tributaries—not the property owner's ability to make a buck or to build whatever they desire.

In addition, the Petitioner must show that the houses must not "alter the essential character of the neighborhood or district in which the lot is located." *Id.* § 3–1–207(c)(2)(i). We do not believe that the style of the houses, in and of themselves, would alter the "essential character of the neighborhood." *Id.* § 3–1–207(c)(1), (c)(2)(i). However, because of the environmentally sensitive nature of the properties and the surrounding area, we believe that the addition of such large structures within the 100 foot CA buffer and with the additional woodland clearing would alter the character of the surrounding neighborhood.

The Petitioners must also show that "the granting of the variance will not substantially impair the appropriate use or development of adjacent property." *Id.* § 3–1–207(c)(2)(ii). The surrounding community is completely developed. Testimony provided by both parties established the Livesay property on the east side of Site # 1 has been redeveloped in recent years. Therefore, we find that there would not be any impairment on the development of neighboring properties. However, we find the testimony of Mr. Flood persuasive and agree that the addition of such large structures will create a significant amount of additional water quality problems that could render the creek impassable within the coming years. Accordingly, we find that granting the requested variances would impair the use of adjacent properties.

The Petitioners' next hurdle requires them to show that "the granting of the variance will not reduce forest cover in the limited development and resource conservation areas of the critical area." *Id.* § 3–1–207(c)(2)(iii). The property is classified as LDA. The Petitioners' proposal provides for a mitigation of 3:1. **As such, we find that there would be a brief reduction of forest cover in the LDA; however, replanting at 3:1 on site would add additional forest cover and plantings to satisfy the requirements of the Code.**

The Petitioners must also establish that "the granting of the variance will not be contrary to acceptable clearing and replanting practices required for development in the critical area or a bog protection area." *Id.* § 3–1–207(c)(2)(iv). As we previously addressed, the Petitioner would be required to mitigate at 3:1 for reducing forest cover in an LDA. The testimony provided by Ms. Schwab established that the Petitioner will follow all clearing and replanting practices. **She created a vegetative plan for the sites that is in accord with the Code. Therefore, we find that the Petitioner's variance would not be contrary to the Code.**

Lastly, the Petitioners must show that "the granting of the variance will not be detrimental to the public welfare." *Id.* § 3–1–207(c)(2)(v). **Normally, granting variances to allow for the construction of a dwelling within the CA would not be detrimental to the public welfare. However, here we believe that the size of the proposed houses would add too much impervious surface and would cause a significant drop in the quality of the water. In addition, there would be significant interference to the wildlife and vegetation that have called these lots home. Thus, we find that the granting of the requested variances would be detrimental to the public welfare.**

(Emphasis added.)

The Board's decision was filed on January 30, 2007. On April 9, 2007, this Court issued its decision in *Becker v. Anne Arundel County,* 174 Md.App. 114, 145, 920 A.2d 1118 (2007).

### D. The Circuit Court's Decision

Moreland filed a petition for judicial review, arguing the Board's denial of the variances was based on general policy grounds as opposed to its consideration of the evidence specific to this case. Moreland also argued that the Board failed to state its reasons for concluding that Moreland's application did not satisfy the requirement that each variance granted must be the "minimum variance necessary to afford relief." The circuit court reversed and remanded the Board's decision, finding that it failed to provide reasoned explanations based upon the evidence presented to it to permit the parties to make reasonable decisions and to allow meaningful judicial review, as necessitated by *Becker.*

We will provide additional facts as necessary in the opinion.

### The Parties' Contentions

The Commission and SRF both contend that the Board's decision was legally adequate. In its brief, the Commission emphasizes that, in order to prevail, the appellees needed to convince the Board that it met each and every requirement of the variance provisions of the Code. The Commission seeks to distinguish the instant case from *Becker.* It argues that, in addition to variances from the County's critical area development standards, the applicants in *Becker* also sought a variance from the County's 25 foot rear yard building setback provision (which has a less stringent variance procedure) and that the Board's opinion in *Becker* blurred the distinction between the two standards. The Commission also contends that the Board provided sufficient detail in its opinion to permit the parties and reviewing courts to discern the criteria and facts the Board found dispositive. The Commission points to evidence in the record to support the Board's findings.

■ SRF notes that the Board identified six variance standards that Moreland had failed to meet. It points out, correctly, that the circuit court addressed only five of the Board's

findings in its opinion and that the circuit court should be reversed for that reason.[13]

In addition, SRF argues that a reviewing court can examine the entire record before the Board in order to find a legally sufficient basis for the Board's decision and is not limited to the analysis in the Board's decision.

## II. Discussion

### A. Standard of Review

The scope of judicial review of administrative agency action is narrow. " 'The court's task on review is not to substitute its judgment for the expertise of those persons who constitute the administrative agency....' " *People's Counsel v. Loyola,* 406 Md. 54, 66, 956 A.2d 166 (2008) (quoting *United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 576–77, 650 A.2d 226 (1994)). Courts " 'inquire whether the zoning body's determination was supported by "such evidence as a reasonable mind might accept as adequate to support a conclusion...." ' " *Loyola,* 406 Md. at 67, 956 A.2d 166 (quoting *Surina,* 400 Md. at 681, 929 A.2d 899, quoting in turn *Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 398, 396 A.2d 1080 (1979)); *see Insurance Comm'r v. Nat'l Bureau of Cas. Underwriters,* 248 Md. 292, 309, 236 A.2d 282 (1967). If there is such evidence in the record before the agency, and the agency's decision is not premised upon an error of law, the agency's decision must be upheld. *Ad + Soil, Inc. v. County Comm'rs of Queen Anne's County,* 307 Md. 307, 338, 513 A.2d 893 (1986).

Courts typically do not defer to legal conclusions reached by agencies. *Loyola,* 406 Md. at 68, 956 A.2d 166

---

**13.** We will dispose of this argument. When reviewing decisions of administrative agencies, appellate courts " 'look through the [lower] court's decision[ ], although applying the same standard of review, and evaluate[ ] the decision of the agency.' " *People's Counsel v. Loyola,* 406 Md. 54, 66, 956 A.2d 166 (2008) (quoting *People's Counsel v. Surina,* 400 Md. 662, 681, 929 A.2d 899 (2007)). Thus, oversight, if any, on the part of the circuit court is irrelevant. The decision of the Board is the focus of our attention.

(citing *Belvoir Farms v. North*, 355 Md. 259, 267–268, 734 A.2d 227 (1999)). Courts do afford a "degree of deference" to agency interpretations of ordinances and regulations the agency itself has promulgated or administered. *Id.* (citing *Marzullo v. Kahl*, 366 Md. 158, 172, 783 A.2d 169 (2001)). However, the appropriate deference is finite. *See Loyola*, 406 Md. at 67, 956 A.2d 166 (zoning board's interpretation of case law not entitled to deference).

▋ Since courts cannot substitute their judgment for that of an agency, a court may affirm an agency's final decision only on the grounds on which it decided the matter. *Evans v. Burruss*, 401 Md. 586, 593, 933 A.2d 872 (2007); *Dep't of Health & Mental Hygiene v. Campbell*, 364 Md. 108, 111 n. 1, 771 A.2d 1051 (2001); *Frey v. Comptroller of the Treasury*, 184 Md.App. 315, 332, 965 A.2d 923 (2009). As a necessary corollary, the agency must explain the basis for its decision. *Board of County Comm'rs for Prince George's County v. Ziegler*, 244 Md. 224, 229, 223 A.2d 255 (1966); *Mortimer v. Howard Research & Dev. Corp.*, 83 Md.App. 432, 441, 575 A.2d 750 (1990). The agency's explanation of its decision must be detailed enough to permit a reviewing court to fully understand the reasons for the agency's decision and must be based upon sufficient facts in the record. Findings of fact that merely restate "statutory criteria, broad conclusory statements, or boilerplate resolutions" are inadequate. *Murrell v. Mayor & City Council*, 376 Md. 170, 199, 829 A.2d 548 (2003); *Bucktail, LLC v. County Council of Talbot County*, 352 Md. 530, 533, 723 A.2d 440 (1999).

In *Becker*, we applied these principles to a zoning board's decision to deny a variance application. 174 Md.App. at 145, 920 A.2d 1118. Judge James Eyler's analysis in *Becker* is particularly instructive. Like the case before us, *Becker* involved an appeal from the Board's denial of an application for variances that were needed to construct a home in the critical area buffer. *Id.* at 122–23, 920 A.2d 1118. In *Becker*, as in the instant case, the Board indicated that it recognized that, without variances, construction of houses on the lots

would be impossible. *Id.* at 145, 920 A.2d 1118. In this context, Judge Eyler explained, *id.* at 141–42, 920 A.2d 1118:

A meaningful Board explanation is especially important when, as here, a house can be legally built on the property in question, but not without variances, and a potential constitutional taking is a serious concern. Separate findings by the Board, and explanation of those findings, will facilitate meaningful judicial review and/or advise appellants of the basis for the Board's decision so they can make an informed decision as to future action.

Judge Eyler continued his analysis later in the opinion:

[T]he Board concluded that appellants' specific variance requests did not satisfy the applicable criteria and, based on the evidence, with adequate findings as to appellants' needs and adequate explanation as to how they can be met, a denial could be upheld.

At some point, however, assuming new and different variance requests in the future, a denial of variances would effect an unconstitutional taking. Under the circumstances of this case, the Board's opinion is deficient, and we shall direct that the matter be remanded to the Board. On remand, the Board may receive additional evidence, if offered by any or all of the parties. The Board must provide a statement of reasons for its decision that go beyond repeating the words in the Code, and which include references to the evidence, so as to enable the parties to make reasonable decisions, if the variance requests are denied, and to permit meaningful judicial review, if that is requested.

A statement by the Board that it is not persuaded that the minimum necessary standard has been met is not a statement as to why it has not been met, with reference to the evidence. The situation before us is not one in which an administrative body has discretion to perform or not perform some act. In that situation, depending on the circumstances, a failure to be persuaded by the party having the burden of persuasion may be a sufficient explanation by the

agency for its failure to act. In this case, the Board has an obligation to grant or deny variance requests. If an applicant establishes compliance with the applicable criteria, that applicant is entitled to the variance. The Board has the obligation to determine compliance, but the result is not discretionary; the result flows from the determination. Thus, whether it grants or denies the requested variance, the Board has an obligation to explain its decision.

*Id.* at 145–46, 920 A.2d 1118.

## B. Analysis

The Board found that Moreland failed to meet its burden of persuasion with regard to six of the variance criteria contained in County Code § 3–1–207. We begin our analysis of the Boards's findings by noting that the Board found that Moreland satisfied several of the variance criteria, namely:

[S]trict adherence to the critical area requirements would result in an unwarranted hardship (§ 3–1–207(b)(1));

Moreland would be deprived of rights commonly enjoyed by others if the critical area requirements were to be applied literally to its property (§ 3–1–207(b)(2)(i));

[G]ranting the requested variances would not confer a special privilege upon Moreland (§ 3–1–207(b)(3));

[T]he requested variances are not required because of any acts of the petitioner or to that on neighboring property. (§ 3–1–207(b)(4));

While construction "would cause a brief reduction in forest cover," Moreland's proposed replanting plan "would add additional forest cover and planting to satisfy the requirements of the Code" (§ 3–1–207(c)(2)(iii)); and

Moreland's replanting plan, which called for replacing vegetation removed to make way for the proposed structures or otherwise damaged or destroyed in the construction process at the rate of three new plants for each plant removed, satisfied the Code's requirements for forest restoration within the critical area. (§ 3–1–207(c)(2)(iii)).

None of these findings are challenged by the parties. We will evaluate each controverted finding by the Board separately.

*(1)*

 Section 3–1–207(b)(5) of the County Code requires an applicant to prove that "[t]he granting of a variance will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat within the County's critical area . . . and will be in harmony with the general spirit and intent of the County's critical area . . . program." With regard to these requirements, the Board found:

> [T]he proposed sizes of the houses would create additional impervious surface, which would result in an adverse impact on wildlife and the plant habitat of the lots and a significant detriment to the water quality of the creek. In addition, we are not convinced that the proposed SWM [storm water management plan] would provide the necessary controls needed to handle the additional impervious surfaces that the Petitioner proposes. The large amount of impervious coverage so close to the creek would reduce vegetative cover and alter the hydrology of the area.

 The Board did not indicate what specific evidence it relied upon to reach this conclusion. Nor did it identify what the adverse impacts on wildlife and plant habitat might be. This point is particularly significant because, as we have noted, the Board also made what may be partially inconsistent findings that Moreland's planting plan "would add additional forest cover and plantings to satisfy the requirements of the Code." The Board did not identify a "significant detriment" to Warehouse Creek, nor state how the hydrology of the area would be affected, nor indicate how the proposed construction of the two houses and their related driveways and other areas of impervious surfaces would cause such harm. Finally, the Board did not explain why it was not convinced that the storm water management plan proposed by Moreland would be sufficient. "A statement by the Board that it is not persuaded that the minimum necessary standard has been met is not a

statement as to why it has not been met, with reference to the evidence." *Becker*, 174 Md.App. at 145, 920 A.2d 1118.

The Commission argues that the findings by the Board are as detailed as those approved by the Court of Appeals in *Alviani v. Dixon*, 365 Md. 95, 119, 775 A.2d 1234 (2001). We do not agree.

*Alviani* was a variance case. Before granting the variances requested, the Board was required to make a finding that the granting of the variance will not:

(i) alter the essential character of the neighborhood or district in which the lot is located....

365 Md. at 118, 775 A.2d 1234 (quoting Anne Arundel County Code § 2–107(c)).

The Board found:

The granting of the three requested variances will not alter the essential character of this area. *This neighborhood is developed with a mix of residential and commercial uses and is heavily impacted by its close proximity to Route 50 and its access ramps. The commercial uses are clustered along Route 50, as is the subject property, while the residential properties are further from the highway.* The subject property is within the C1B district and is permitted to accommodate commercial uses. It is also immediately adjacent to Route 50 and a commercially developed property. The canopy will not encroach on the required setbacks to residential property, but rather, the [setback from the] Route 50 right-of-way.

365 Md. at 119, 775 A.2d 1234 (emphasis added in *Alviani*).

With regard to this finding, the Court of Appeals stated:

We find the description of the neighborhood stated by the Board to be sufficient to satisfy the requirement of section 2–107(c)(i). The Board's description is precise enough to enable a party or an appellate court to comprehend the area that the Board considered when deciding to grant the variances. Furthermore, we cannot foresee how a more specific description of a larger or smaller neighborhood

would have led the Board to determine that the three variances that were granted would alter the essential character of the neighborhood. *The Board's Memorandum and Opinion clearly explains the Board's reasoning behind the granting of the variances,* and its explanation of the considered neighborhood properly led to an understanding of the area the Board considered when granting the variances.

*Id.* at 119–20, 775 A.2d 1234 (emphasis added).

The Board's reasoning in *Alviani* was clear: the neighborhood's proximity to a busy highway was the reason why expansion of the service station would not negatively affect surrounding properties. In contrast, the Board's finding in the case before us leaves us at a loss as to the reasoning behind the Board's decision.

### (2)

Section 3–1–207(b)(7) of Code requires an applicant to prove "by competent and substantial evidence" that it has overcome the NR § 8–1808(d)(2)(ii)'s statutory presumption that variances do not "conform with the general purpose and intent" of the Act, regulations adopted thereunder and the requirements of the County's program. The Board found:

> Like the other property owners in the community, the Petitioner wants to develop his property and we cannot fault him for that. However, here the Petitioner proposes to build two houses inside the 100 foot buffer and with more clearing than permitted by the Code. Allowing the Petitioner to build the houses as proposed is not necessary to avoid denying the Petitioner a reasonable and significant use of his property. Alternative plans exist that would provide for less disturbance to the CA. Therefore, we find that the Petitioner's proposed houses fall outside the intent of the CA programs.

The Board's findings are insufficient. First, the Board did not identify to what "alternative plans" it was referring and, in any event, the Board failed to explain how those plans, if implemented, would result in less disturbance to the critical

area. The Board provided no analysis to support its conclusion that "allowing [Moreland] to build the houses as proposed [was] not necessary to avoid denying . . . a reasonable and significant use" of the two lots.

*(3)*

██ Section 3–1–207(c)(i) requires an applicant to prove that the variances "must be the minimum variance necessary to afford relief." The Board found:

> [T]he Petitioner has the burden of proving that "the variance is the minimum variance necessary to afford relief." Code, § 3–1–207(c)(i). The houses proposed by the Petitioners are average in size for the community. The Petitioner made several modifications throughout the planning process in an effort to build with the least disturbance to the CA as possible. However, we find it difficult to believe that the houses as proposed are the minimum necessary to afford the Petitioner relief. With an environmentally sensitive property such as these, State and County regulations required that the variance be the absolute minimum necessary to grant relief. This minimum must protect the CA—not the Petitioner's idea of what size home they would prefer on the property. The CA Program was designed to protect the Chesapeake Bay and its tributaries—not the property owner's ability to make a buck or to build whatever they desire.

In the context of a similar finding made by the Board in *Becker*, we stated:

> The question of whether the variances were the minimum necessary must be considered, however, in the context of the purpose of the proposed construction, recognizing that appellants are entitled to build some type of reasonable structure. There was no finding by the Board as to appellants' reasonable needs, or reference to evidence, and why the proposed structure was not the minimum necessary to meet those needs.[] On remand, the Board must provide an explanation.

174 Md.App. at 144, 920 A.2d 1118 (footnote omitted). Because we will remand this case to the Board as well, we think it useful to explain in some detail elements of the proper analysis to be employed by the Board on remand.

Several participants at the Board hearing suggested that the Board's obligation to grant the "minimum variance necessary to provide relief" would be satisfied by granting variances to permit the construction of homes of not more than 600 square feet. This figure was apparently derived from a provision in the County Code (which we gather from the record has since been repealed) establishing that figure as the minimum square footage for a single family dwelling. The notion that the Board is limited to granting variances to permit only residences of legally mandated minimum size is incorrect.

The Act authorizes boards of appeal to grant variances from the strict application of critical area regulations when, without the variance, "an applicant would be denied reasonable and significant use" of the property. NR § 8–1808(d)(1). In *Belvoir Farms v. North,* 355 Md. 259, 282, 734 A.2d 227 (1999), the Court of Appeals held that the term "reasonable and significant use" was less restrictive than the constitutional takings standard:

An unconstitutional taking of property generally is proved when a "regulation denies all economically beneficial or productive use of land." *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *see also Dolan v. City of Tigard,* 512 U.S. 374, 385, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) ("A land use regulation does not effect a taking if it . . . does not 'deny an owner economically viable use of his land.' " (quoting *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)) (alteration in original)).

We reject the proposition that the unnecessary or unwarranted hardship standard is equal to an unconstitutional taking standard. If this were true, it would be a superfluous standard because the constitutional standard exists

independent of variance standards. We generally avoid a construction of statutory language that would render the statute unnecessary, meaningless, or redundant.

We hold, therefore, that the unnecessary or unwarranted hardship standard, or similar standards, are less restrictive than the unconstitutional taking standard. The unwarranted hardship standard, and its similar manifestations, are equivalent to the denial of reasonable and significant use of the property. Whether a property owner has been denied reasonable and significant use of his property is a question of fact best addressed by the expertise of the Board of Appeals, not the courts.

*Id.* at 282, 734 A.2d 227 (citations omitted).

As this Court explained in *Becker,* the General Assembly amended NR 8–1808(d) in 2002 and 2005. 174 Md.App. at 131–32, 920 A.2d 1118. Neither of these amendments affected the "denial of reasonable and significant use" standard enunciated in *Belvoir Farms.*[14]

 In the statute, "minimum" modifies "variance," not "use." The statutory mandate to grant only the "minimum variance necessary to afford relief" refers to variances necessary to allow a "reasonable and significant use," not a minimal use, of the property in question.

In the context of cases such as the one before us, a variance does not, in and of itself, protect the Bay's environment. A variance permits the construction of a structure that is otherwise prohibited by the terms of the County's critical area program. The distinction goes beyond semantics. The purpose of the variance procedure is to permit the Board to determine, based upon the evidence, whether the variances requested are the minimum necessary to permit a reasonable and significant use of the property and, if they are, whether

---

**14.** In addition, the legislature amended NR 8–1808(d) in 2008, ch. 119, Acts of 2008 and again in 2009, chs., 650 and 651, Act of 2009. None of these amendments pertain to the matter at issue.

the proposal can be accommodated on the property in compliance with the statutory criteria.

Cases such as this present an appeals board with a spectrum of choices. A board may deny an application because it determines that requested variances would permit the construction of a house that exceeds what the board finds to be a reasonable and significant use for the property. A board may deny an application because, even though the variances requested are the minimum necessary to permit a reasonable and significant use, there is a threat of real harm to the environment or other violation of the standards that is not adequately addressed in the application. Finally, a board may deny an application because, even though the variance request meets the "minimum necessary" test, there will be a real harm to the environment or other violation of the variance standards that cannot be adequately addressed or remediated by the applicant. But in any case, the zoning appeals board must clearly explain the basis for its decision so that an unsuccessful applicant may, depending upon the circumstances and the basis of the decision, either amend its proposal or explore other remedies.

These considerations lead to the conclusion that where, as in the instant case, the Board decides that the requested variances are not the minimum necessary to permit a reasonable and significant use, the Board, in order to make its explanation meaningful, must determine what the minimum variances are to permit such a use. This determination is to be made on a case by case basis, *Belvoir Farms,* 355 Md. at 282, 734 A.2d 227, that is, based upon the evidence presented to it. At a minimum, the Board must consider the nature of the community in which the lots are located, the sizes of the proposed houses relative to those of surrounding properties and the degree to which surrounding houses have been built within the buffer.[15]

---

15. There may be other factors as well. For example, in a proper case, the Board should consider evidence of a disability that requires special

*(4)*

 Section 3–1–207(c)(2)(i) requires an applicant to prove that the variances will "not alter the essential character of the neighborhood or district in which the lot is located." The Board made two findings regarding this criterion. First, it found that the style of the houses, in and of themselves, would not alter the "essential character of the neighborhood." Second, the Board found:

> However, because of the environmentally sensitive nature of the properties and the surrounding area, we believe that the addition of such large structures within the 100 foot CA buffer and with the additional woodland clearing would alter the character of the surrounding neighborhood.

The Board provided no explanation for its conclusion. As previously explained, the findings are insufficient for that reason. Additionally, the Board's finding that the addition of structures of the size proposed by Moreland and the lot clearing necessary to accommodate those structures, would alter the character of the surrounding neighborhood may be inconsistent with: (1) its finding that the style of the houses are consistent with the character of the neighborhood, (2) its finding that the surrounding community is completely developed with waterfront single-family dwellings, many of which are in the buffer and which exceed 2,000 square feet in area, and (3) its finding that the variance, if granted will not reduce forest cover. Upon remand, the Board must provide an explanation of its conclusion and, to the extent necessary, reconcile its apparently inconsistent findings.

*(5)*

 The applicant was required to demonstrate that the variances will not substantially impair the appropriate use or development of adjacent property. Code § 3–1–207(c)(2). The parties do not debate the fact that the surrounding

---

accommodations. *See* NR § 8–1008(c)(1)(xii); *Mastandrea v. North,* 361 Md. 107, 136–37, 760 A.2d 677 (2000); *Becker,* 174 Md.App. at 144, 920 A.2d 1118.

community is fully developed. The Board, however, found that development of the properties would interfere with the appropriate use of surrounding properties:

[W]e find that there would not be any impairment on the development of neighboring properties. However, we find the testimony of Mr. Flood persuasive and agree that the addition of such large structures will create a significant amount of additional water quality problems that could render the creek impassable within the coming years.

We must defer to the Board's conclusion if it is fairly debatable, that is, when a reasonable person, after considering the same evidence, could have reached the same conclusions as the agency. *Stansbury v. Jones,* 372 Md. 172, 182–83, 812 A.2d 312 (2002); *Insurance Comm'r v. Nat'l Bureau,* 248 Md. at 309, 236 A.2d 282. We will consider the evidence the Board relied upon for its conclusion.

Mr. Flood testified at length about the negative effects to water quality that would result if the variances were granted. He stated that the buffer area in both lots was "highly functional" because it was fully vegetated. He continued:

So for water quality function, it is uptaking nutrients because there's a multiple layer [sic] of vegetation there catching rainfall, holding the soil, absorbing and uptaking nutrients. When you take that away in the buffer, that function can't be replicated in a fully vegetated buffer. Now, I understand that there's some plantings that are proposed that are supposed to mitigate water quality.... [But] for water quality function[,] you're going to have pretty much of a wash there.

You do have a net loss in ability for the buffer to function for water quality when you take a footprint and pave it. We can no longer uptake any nutrients. Then the runoff must be handled by the rest of the buffer that may remain intact and may have all native plants in it, but it still doesn't have any higher ability to absorb these additional nutrients. So any impervious surface you have is going to contribute to an increase in nutrients migrating off the site.

\* \* \* \*

[Do] not create a scenario where a failed septic system, because the toilet runs constantly, and they have a lot of guests, and the ground is saturated from multiple rains, ultimately sometime, when we get an Agnes or some 100–year storm event we're creating a situation there where these layers of sedimentary soil can become plastic and flow. And if you've ever seen a whole section of back [sic] disconnect and come down a slope, that's what causes it. . . . And then you add in a big footprint up there in that buffer that says, no roots here, just house. No structure for the soil to hold together. You're weakening that soil in that bank and you will create a condition that will adversely affect water quality, whether water goes in the ground or across the top, it's going to carry nutrients into the water-way.[16]

No reasoning mind could conclude from this evidence that construction of the two houses as proposed by Moreland would render Warehouse Creek impassable as Mr. Flood did not address the issue in any manner in his testimony.[17]

### (6)

 Finally, Code § 3–1–207(c)(2)(v) required Moreland to demonstrate that granting the variances would not "be detrimental to the public welfare." The Board found:

———

**16.** On cross-examination, Mr. Flood admitted that he had performed no soil studies on either lot but that "I know for certain from soil maps and firsthand knowledge of that whole area that this is the type of soil that exists there."

**17.** In its brief, the SRF suggests that other witnesses testified as to siltation in the creek and that from this evidence "it can be easily inferred that the Moreland development might impair the ability of those who wish to develop their waterfront lots along Warehouse Creek as accessible by boat." Without addressing the merits of this argument, we note that the Board's opinion is clear that the Board was relying on Mr. Flood's testimony, not that of other witnesses. We decline the invitation to substitute our judgment for that of the Board's. *Evans v. Burruss*, 401 Md. at 593, 933 A.2d 872; *Frey v. Comptroller of the Treasury*, 184 Md.App. at 332, 965 A.2d 923.

Normally, granting variances to allow for the construction of a dwelling within the CA would not be detrimental to the public welfare. However, here we believe that the size of the proposed houses would add too much impervious surface and would cause a significant drop in the quality of the water. In addition, there would be significant interference to the wildlife and vegetation that have called these lots home. Thus, we find that the granting of the requested variances would be detrimental to the public welfare.

The Board's findings as to the ultimate statutory criterion suffer from many of the same defects identified in previous findings. While the Board indicated that the size of the proposed houses would add "too much" impervious surface and cause a significant drop in water quality, it did not provide an explanation for either conclusion. The Board's obligations are not discharged by such broad, conclusory and unsupported statements. Similarly, the Board's statement that "there would be significant interference to the wildlife and vegetation that have called these lots home" fails to provide an indication as to what wildlife and what vegetation the Board had in mind. The Board's failure to provide an explanation is significant because it found that Moreland's proposed replanting plan for replacing vegetation removed to make way for the proposed structures or otherwise damaged or destroyed in the construction process satisfied the requirements of the pertinent provision of the Code (§ 3–1–207(c)(2)(iii)). The Board must explain its conclusions and address the apparent inconsistency between its findings under the two other statutory criteria.

In summary, we agree with the circuit court's conclusion that the application must be remanded to the Board for the Board to address the deficiencies in its findings and to reconsider its decision. Consistent with our disposition in *Becker*, the Board may consider additional evidence offered by the parties. 174 Md.App. at 145, 920 A.2d 1118.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY IS AFFIRMED AND THE CASE IS REMANDED TO THAT COURT WITH INSTRUCTIONS**

TO REMAND THE MATTER TO THE BOARD FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANTS.