12 A.3d 1223

CRITICAL AREA COMMISSION FOR the CHESAPEAKE
AND ATLANTIC COASTAL BAYS, et al.

v.

MORELAND, LLC, et al.

No. 55, Sept. Term, 2010.

Court of Appeals of Maryland.

Jan. 28, 2011.

Paul J. Cucuzzella, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, and Rachel L. Eisenhauer, Asst. Atty. Gen., Department of Natural Resources, Annapolis, MD), on brief, for petitioners.

Jon A. Mueller, Annapolis, MD, for petitioners.

David M. Plott (Charles R. Schaller and Benjamin S. Wechsler of Linowes and Blocher LLP, Annapolis, MD), on brief, for respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, J.

In this case involving the denial of an application for variances from requirements of a local critical area program, we are asked to consider what level of detail a Board of Appeals must employ in supporting its findings with evidentiary references, in order to enable meaningful judicial review. The Anne Arundel County Board of Appeals had denied variance [1] requests of Moreland, LLC,[2] in connection with the proposed construction of two residences on Warehouse Creek in Edgewater, within the critical area buffer in Anne Arundel County.[3] The variances requested would have enabled the construction of both houses within the buffer, in contravention of Section 17–8–301(b) of the Anne Arundel County Code[4] and also

---

1. A variance refers to "administrative relief which may be granted from the strict application of a particular development limitation in the zoning ordinance." *Mayor & Council of Rockville v. Rylyns Enterprises, Inc.*, 372 Md. 514, 537, 814 A.2d 469, 482 (2002), quoting Stanley D. Abrams, *Guide to Maryland Zoning Decisions*, § 11.1 (3d. ed.Michie 1992).

2. Moreland, LLC, a real estate developer, purchased two parcels, "Site 1" and "Site 2," on Warehouse Creek in 2003. Thereafter, in June of 2008, while the present case was pending in the Court of Special Appeals, Moreland sold Site 2 to Anthony and Barbara Grimaldi; all parties agreed that the Grimaldis should be joined as parties, and they were on March 17, 2009 before the Court of Special Appeals. We shall, therefore, refer to Moreland, LLC and the Grimaldis collectively as "Moreland."

3. The critical area buffer is defined in Section 18–13–104(a) of the Anne Arundel County Code as follows:

 (a) **Buffer and expanded buffer.** Except as provided in subsection (b), there shall be a minimum 100–foot buffer landward from the mean high-water line of tidal waters, tributary streams, and tidal wetlands. The 100–foot buffer shall be expanded beyond 100 feet to include contiguous sensitive areas, such as slopes of 15% or greater and hydric soils or highly erodible soils whose development may impact streams, wetlands, or other aquatic environments. If there are contiguous slopes of 15% or greater, the buffer shall be expanded by the greater of four feet for every 1% of slope or to the top of the slope and shall include all land within 50 feet of the top of the slopes.

4. Section 17–8–301(b) of the Anne Arundel County Code, governing new structures, provides:

would have allowed the clearing of a greater percentage of vegetation from the sites than otherwise permitted by Section 17–8–601(b) of the Code.[5]

Initially, an administrative hearing officer had denied the variance requests, and the Board of Appeals, after conducting three nights of evidentiary hearings over the course of several months in 2006, affirmed in a fourteen-page memorandum opinion. Moreland sought judicial review in the Circuit Court for Anne Arundel County,[6] which remanded the case to the Board, having determined that the Board failed to adequately

---

(b) **Prohibitions and exceptions.** New structures are prohibited in the 100–foot buffer and expanded buffer provided for in § 18–13–104 of this Code, except that water dependent uses or shore erosion protection measures are allowed and roads, bridges, and utilities may be located in the buffer if there is no other feasible alternative and the roads, bridges, and utilities are located, designed, constructed, and maintained in accordance with the requirements of § 17–8–505.

5. Section 17–8–601(b) of the Anne Arundel County Code, governing the clearing of vegetation, states:

(b) **Other lots.** Clearing on lots in the [Limited Development Area] and [Resource Conservation Area] other than residential lots of one-half acre or less in existence on or before December 1, 1985 may not exceed 20% of the lot, except that the Office of Planning and Zoning may approve clearing up to 30%.

6. Moreland filed a "Petition for Judicial Review" in the Circuit Court, seeking a reversal of the Board of Appeals's decision denying the variance requests. Appearing in opposition was the South River Federation, a private non-profit organization with a mission to "protect, preserve, restore, and celebrate the South River and its interdependent living community," South River Federation Mission, http://southriver federation.net/index.php/about-us/mission (last visited Jan. 25, 2011). The South River Park Citizens Association, another private non-profit organization, also filed a "Notice of Intent to Participate" pursuant to Rule 7–204(a), which provides:

(a) **Who may file; contents.** Any person, including the agency, who is entitled by law to be a party and who wishes to participate as a party shall file a response to the petition. The response shall state the intent to participate in the action for judicial review. No other allegations are necessary.

The Association contended that it was "an interested person through its members Ross Voorhees and Peter Quirk," who had offered testimony before the Board of Appeals. Similarly, Kenneth Malley, a neighbor of the property, also filed a "Notice of Intent to Participate" pursuant to Rule 7–204(a).

support in its written decision any of its adverse findings with references to specific evidence. The Critical Area Commission for the Chesapeake and Atlantic Coastal Bays [7] and the South River Federation appealed, and the Court of Special Appeals, in a reported opinion, *Critical Area Comm'n for the Chesapeake and Atlantic Coastal Bays v. Moreland, LLC*, 191 Md.App. 260, 991 A.2d 138 (2010), agreed with the Circuit Court. We granted certiorari, 415 Md. 40, 997 A.2d 790 (2010), to consider the following questions:

1. Did the Board of Appeals provide sufficient reasoning for its conclusion that the variance applicants had failed to establish that their proposed development would not adversely affect water quality and that their variances were the minimum necessary to afford the applicants relief from applicable Critical Area development restrictions, where the Board of Appeals, in a fourteen page Memorandum Opinion, summarized and repeatedly referenced expert and professional testimony regarding the adverse environmental impacts associated with the proposed development?

2. Did the Court of Special Appeals erroneously conclude that the Board of Appeals, when reviewing whether a variance to construct a home in the Critical Area buffer is the "minimum variance necessary," must consider the size of the proposed construction relative to the size of homes on neighboring parcels, when such community comparisons are separately considered under the variance criteria?

3. Did the Court of Special Appeals incorrectly apply the presumption that construction proposed in the buffer will harm water quality?

We shall hold that the evidentiary support cited in the decision of the Anne Arundel County Board of Appeals was adequate for purposes of enabling meaningful judicial review, specifical-

7. Section 8–1812(a) of the Natural Resources Article, Maryland Code (1974, 2000 Repl.Vol., 2005 Supp.), authorizes the Critical Area Commission to "intervene in any administrative, judicial, or other original proceeding or appeal in this State concerning a project approval in the Chesapeake Bay Critical Area. . . ."

ly regarding the adverse impact on water quality associated with the proposed development by Moreland, and we, therefore, shall reverse the Court of Special Appeals's decision. Because our holding regarding the first question disposes of the matter, we need not address questions 2 and 3 and shall not.

In 1984, the General Assembly enacted the Chesapeake Bay Critical Area Protection Program, *see* Maryland Code (1973, 2000 Repl. Vol., 2005 Supp.), Sections 8–1801 to 8–1817 of the Natural Resources Article,[8] embracing several key policy choices, namely that the Chesapeake Bay and its tributaries "are natural resources of great significance to the State and the nation," that the shoreline constitutes "a valuable, fragile, and sensitive part of this estuarine system," that "[h]uman activity is harmful in these shoreline areas," and that "[t]he cumulative impact of current development and of each new development activity in the buffer is inimical" to the restoration of the quality and productivity of the waters of the Bay.[9] Sections 8–1801(a)(1), (2), (4), and (9).

---

8. All references to Sections 8–1801 to 8–1817 throughout are to the Natural Resources Article, Maryland Code (1974, 2000 Repl.Vol., 2005 Supp.). All references are to the 2005 Supplement to the 2000 Replacement Volume, which was in effect at the time the acts in question occurred, although Section 8–1801 *et seq.* has not been substantially altered in the 2007 Replacement Volume.

9. There appears to be a number of significant environmental benefits of requiring a permanently protected buffer between upland land uses and tidal waters, tidal wetlands, and tributary streams, including:
 - The removal or reduction of sediments, nutrients, and potentially harmful or toxic substances in runoff entering the Bays and their tributaries.
 - Minimization of the adverse effects of human activities on wetlands, shorelines, stream banks, tidal waters and aquatic resources.
 - Maintenance of an area of transitional habitat between aquatic and upland communities.
 - Maintenance of the natural environment of streams.
 - Protection of riparian wildlife habitat.

 Critical Area Commission for the Chesapeake and Atlantic Coastal Bays, *Bay Smart, A Citizen's Guide to Maryland's Critical Area Program*, 47–50, (Dec.2008), http://www.dnr.state.md.us/criticalarea/download/baysmart.pdf.

The Program required all local jurisdictions, under the direction of a newly created Chesapeake Bay Critical Area Commission, to formulate and implement a plan to control development in the "critical" or protected area. Section 8–1801(b). That area generally consists of the Chesapeake Bay, its tributaries to the head of tide,[10] all designated State and private wetlands, and all land and water areas within 1,000 feet beyond the landward boundaries of designated State or private wetlands and the heads of tides of the Chesapeake Bay and its tributaries. Section 8–1807(a). The Critical Area Commission, which is comprised of twenty-nine members, including representatives from many counties, is vested with authority to adopt regulations, implement programs, and conduct hearings designed to control development and ameliorate adverse effects of human activity on, in, and near the Bay. Sections 8–1804(a), 8–1806(a).

Anne Arundel County adopted a critical area protection program, embodied in Articles 17 and 18 of the Anne Arundel County Code. Specifically, Section 17–8–301(b) prohibits the construction of "new structures" within the 100–foot buffer:

(b) **Prohibition and exceptions.** New structures are prohibited in the 100–foot buffer and expanded buffer. . . .

The "buffer" is defined in Section 18–13–104(a), generally, as a 100–foot strip of land near the shoreline:

(a) **Buffer and expanded buffer.** Except as provided in subsection (b), there shall be a minimum 100–foot buffer landward from the mean high-water line of tidal waters, tributary streams, and tidal wetlands. . . .

Section 17–8–601(b) permits the clearing of vegetation within a limited range inside the critical area to prevent erosion and other environmental impacts:

---

10. The "head of tide" is defined by the National Oceanic and Atmospheric Administration as "[t]he inland or upstream limit of water affected by the tide." NOAA Shoreline Website: A Guide to National Shoreline Data and Terms, http://shoreline.noaa.gov/glossary.html (last visited Jan. 25, 2011).

(b) **Other lots.** Clearing on lots in the [Limited Development Area] and [Resource Conservation Area] other than residential lots of one-half acre or less in existence on or before December 1, 1985 may not exceed 20% of the lot, except that the Office of Planning and Zoning may approve clearing up to 30%.

The County may grant variances when applicants for such meet various specific requirements detailed in Section 3–1–207 of the Code:

(b) **Variances in the critical area or a bog protection area.** For a property located in the critical area or a bog protection area, a variance to the requirements of the County critical area program or bog protection program may be granted only upon an affirmative written finding that:

(1) because of certain unique physical conditions, such as exceptional topographical conditions peculiar to and inherent in the particular lot, or irregularity, narrowness, or shallowness of lot size and shape, strict implementation of the County's critical area program would result in an unwarranted hardship, as that term is defined in the Natural Resources Article, § 8–1808, of the State Code, to the applicant;

\* \* \*

(3) the granting of a variance will not confer on an applicant any special privilege. . . .

(4) that the variance request:

(i) is not based on conditions or circumstances that are the result of actions by the applicant, including the commencement of development activity before an application for a variance was filed; and

(ii) does not arise from any condition relating to land or building use on any neighboring property;

(5) that the granting of the variance:

(i) will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat within the County's critical area . . .;

(ii) will be in harmony with the general spirit and intent of the County critical area protection program . . .;

*　　*　　*

(7) the applicant, by competent and substantial evidence, has overcome the presumption contained in the Natural Resources Article, § 8–1808(d)(2), of the State Code.

(c) **Required findings.** A variance may not be granted under subsection (a) or (b) unless the Board finds that:

(1) the variance is the minimum necessary to afford relief;

(2) the granting of the variance will not:

(i) alter the essential character of the neighborhood or district in which the lot is located;

(ii) substantially impair the appropriate use or development of adjacent property;

(iii) reduce forest cover in the limited and resource conservation areas of the critical area;

(iv) be contrary to acceptable clearing and replanting practices required for development in the critical area . . .; or

(v) be detrimental to the public welfare.

Failure by the applicant to satisfy even one of the variance criteria requires the denial of the variance application. Section 8–1808(d)(4)(ii) of the Natural Resources Article; Anne Arundel County Code, Section 3–1–207. The proponent of the variance, moreover, bears the burden of proof and persuasion to overcome the presumption that granting the variance requests does not conform to the critical area law. Section 8–1808(d)(3) of the Natural Resources Article.

In 2003, Moreland purchased two parcels, Site # 1 and Site # 2, on the north shore of Warehouse Creek in Anne Arundel County, within the critical area, upon which the developer sought to construct two single-family homes. Thereafter, Moreland requested variances from the Anne Arundel County Office of Planning and Zoning in order to construct the houses

and accompanying septic systems within the buffer and also to remove more vegetation than otherwise permitted within the buffer. In support of the variance requests, Moreland asserted that, "without variance relief from the prohibition on development within the buffer area and from tree clearing limitations, [it] [could] not build any reasonably sized home on these residentially zoned lots."

Specifically, on Site # 1, Moreland proposed to construct a single-family home, attached garage, screened porch and deck totaling 3,343 square feet. To overcome the prohibition in Section 17–8–301(b) of the Code against construction of new structures within the 100–foot buffer, the developer requested a variance of 34 feet. In addition, Moreland sought to clear more than 51 percent of the lot's vegetation, exceeding the maximum 30 percent that the County's Office of Planning and Zoning may approve pursuant to Section 17–8–601(b).

On Site # 2, Moreland sought to construct a home, attached garage, screened porch and uncovered deck totaling 2,615 square feet. To overcome the prohibition in Section 17–8–301(b) of the Code against construction of new structures within the 100–foot buffer, the developer requested another variance of 34 feet into the buffer. In addition, Moreland sought to clear nearly 34 percent of the total vegetation on Site # 2, exceeding the maximum permitted by Section 17–8–601(b) of the Code, and therefore requested an additional variance.

An administrative hearing officer denied Moreland's variance requests, and the Board of Appeals affirmed. On appeal, the Circuit Court, applying *Becker v. Anne Arundel County*, 174 Md.App. 114, 920 A.2d 1118 (2007), reversed, reasoning that the Board failed to make "clear findings" so as to "facilitate meaningful judicial review." The Court of Special Appeals affirmed, also relying upon *Becker*, and determined that the Board failed to indicate "what specific evidence it relied upon" to reach any of its controverted findings. *Moreland*, 191 Md.App. at 286, 991 A.2d at 153.

The *Becker* opinion is obviously the fount in which this controversy rests. In *Becker*, our colleagues on the intermediate appellate court determined that the Board of Appeals, in denying several variance requests, failed to cite any evidence or reasonable inferences to be drawn from the evidence, to support its findings, in the context of no evidence or testimony in opposition to the variances having been adduced before the Board.

In that case, William and Jane Becker had purchased two adjoining lots fronting on the Magothy River and Park Creek in Pasadena on which they sought to build a two-story, ranch-style home, consisting of 2,499 square feet of living space and a 529 square foot two-car garage, within the critical area buffer. To do so, the Beckers requested three variances, namely a variance of 56 feet from the 100–foot critical area buffer, a variance to disturb the steep slopes on both parcels to install the septic system, and a 10–foot variance from the 25–foot rear yard requirement. *Becker*, 174 Md.App. at 122, 920 A.2d at 1123. An administrative hearing officer granted the variances, and an appeal to the Board of Appeals ensued. *Id.* at 119 n. 2, 920 A.2d at 1121 n. 2.

During a hearing before the Board, the Beckers presented testimony that without the variance allowing construction within the 100–foot buffer, the Beckers would not be able to build a house, that the requested variances were the minimum necessary to afford relief, and that the construction "should not have any adverse impact on water quality." *Id.* at 123, 920 A.2d at 1123. Further, testimony was adduced by the Beckers that the granting of the variances "would not be contrary to the spirit and intent of the critical area program." *Id.* No evidence was presented in opposition to the variance requests.

The Board thereafter issued a memorandum opinion denying the Beckers' application, reasoning that the Beckers had failed to demonstrate that the variances requested were the minimum necessary, because "[t]here was no explanation of why 2,500 square feet of living area was necessary. We are

left wondering, why not 2,490 square feet, 2,200 square feet or 600 square feet?" *Id.* at 125, 920 A.2d at 1125. The Board further found, without citing support in the record, that granting the variances would adversely affect water quality, would impair the use and development of the neighboring property, and would be detrimental to the public's welfare, because the Beckers had failed to "convince the Board on these points." *Id.* at 129, 920 A.2d at 1127.

The Court of Special Appeals reversed. Faced with the issue of whether the Board must have made findings based upon articulated evidence, the intermediate appellate court noted that,

> a reviewing court may not uphold an agency's decision if a record of the facts on which the agency acted or a statement of reasons for its actions is lacking.... Findings of fact must be meaningful and cannot simply repeat statutory criteria, broad conclusory statements, or boilerplate resolutions,

*id.* at 138–39, 920 A.2d at 1132–33 (citations omitted) (internal quotation marks omitted), and reasoned that there was no evidence of water quality or developmental impairment on the record before the Board:

> We note that we can find no evidence or reasonable inferences to be drawn from the evidence to support certain of the Board's conclusions. Specifically, we did not see evidence of an adverse impact on water quality, or that the use would impair the use or development of the adjacent property.

*Id.* at 143, 920 A.2d at 1135. Our job, obviously in the present case, is to evaluate the Board of Appeals's decision to determine whether it does permit meaningful judicial review and if so, should it be upheld.

 Our role in reviewing the final decision of an administrative agency, such as the Board of Appeals, is "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an

erroneous conclusion of law." *Maryland Aviation Admin. v. Noland,* 386 Md. 556, 571, 873 A.2d 1145, 1154 (2005), quoting *Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 67, 729 A.2d 376, 380 (1999). In doing so, a reviewing court decides whether the Board's determination was supported by "such evidence as a reasonable mind might accept as adequate to support a conclusion." *People's Counsel for Baltimore County v. Surina,* 400 Md. 662, 681, 929 A.2d 899, 910 (2007) (citation omitted); *see also Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 398–99, 396 A.2d 1080, 1089 (1979) (citation omitted) ("The heart of the fact-finding process often is the drawing of inferences made from the evidence.... The court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness."). Moreover, a reviewing court "must review the agency's decision in the light most favorable to it; ... the agency's decision is prima facie correct and presumed valid." *Noland,* 386 Md. at 571, 873 A.2d at 1154, quoting *CBS v. Comptroller,* 319 Md. 687, 698, 575 A.2d 324, 329 (1990).

 In the present case, Moreland contends that the central issue "is not whether there is substantial evidence in the record," but rather, whether the Board of Appeals's opinion denying the variance requests is amenable to meaningful judicial review. The rub comes from the manner of presentation of the Board of Appeals's opinion.

Moreland argues that, as in *Becker,* the Board of Appeals's opinion in the present case failed to provide sufficient detail and reasoning to enable meaningful judicial review, because each of the Board's findings was not immediately followed by supportive and specific evidentiary references. The Commission counters that the Board of Appeals's opinion adequately reflected that substantial evidence existed in support of its penultimate finding that the proposed construction, because of the large area of impervious surface and the removal of significant amounts of vegetation, would adversely affect the

water quality of Warehouse Creek. The Commission further argues that *Becker* is inapposite, because in the present case, evidence was adduced in opposition to the variance requests upon which the Board explicitly relied.

In denying the variance requests, the Board found that Moreland met various burdens of proof, specifically with regard to Section 3–1–207(b)(1) (that strict implementation of the critical area program would result in unwarranted hardship); (b)(2)(i) (that a literal interpretation of the program would deprive the applicant of rights commonly enjoyed by similarly situated property owners); (b)(3) (that granting the variance would not confer on the applicant any special privilege); (b)(4)(i) (that the hardship was non self-created); (b)(4)(ii) (that the hardship was not caused by a condition on neighboring property); (c)(2)(iii) (that granting the variance would not reduce forest cover); and (c)(2)(iv) (that granting the variance would not be contrary to replanting practices). The Board further found, however, that granting the variances would adversely affect water quality or adversely impact fish, wildlife, or plant habitat within the critical area, in contravention of Section 3–1–207(b)(5)(i), that the variances requested were not the minimum necessary to afford relief pursuant to (c)(1), and that granting the variances would alter the essential character of the neighborhood pursuant to (c)(2)(i), substantially impair the appropriate use or development of adjacent property pursuant to (c)(2)(ii), and be detrimental to the public welfare pursuant to (c)(2)(v). The crux of all of the Board's adverse findings was that the large area of impervious surface of the proposed construction, coupled with clearing large areas of vegetation on the sites, would contribute to excess runoff and the flow of harmful matter into Warehouse Creek.

The Board opined as follows, regarding the large area of impervious surface of the proposed construction, namely, according to the Critical Area Commission, 2,167 square feet of impervious surface on Site # 1 and 1,751 square feet of impervious surface on Site # 2, adversely affecting water quality:

The proposed sizes of the houses would create additional impervious surface, which would result in an adverse impact on wildlife and the plant habitat of the lots and a significant detriment to water quality of the creek.... The large amount of impervious coverage so close to the creek would reduce vegetative cover and alter the hydrology of the area.

\* \* \*

[B]ecause of the environmentally sensitive nature of the properties and the surrounding area, we believe that the addition of such large structures within the 100 foot [critical area] buffer and with the additional woodland clearing would alter the character of the surrounding neighborhood.

\* \* \*

[W]e find the testimony of Mr. Flood [11] persuasive and agree that the addition of such large structures will create a significant amount of additional water quality problems that could render the creek impassable within the coming years.

\* \* \*

[H]ere we believe that the size of the proposed houses would add too much impervious surface and would cause a significant drop in the quality of the water.

The Board further found that clearing of large areas of vegetation from the sites would foster erosion and excess runoff, harming the water quality of the creek:

[B]ecause of the environmentally sensitive nature of the properties and the surrounding area, we believe that the addition of such large structures within the 100 foot [critical area] buffer and with the additional woodland clearing would alter the character of the surrounding neighborhood.

\* \* \*

[H]ere, [Moreland] proposes to build two houses inside the 100 foot buffer and with more clearing than permitted by the Code. Allowing [Moreland] to build the houses as pro-

---

11. Mr. Flood, a neighbor of the properties and a long time South River resident, was accepted by the Board as an environmental expert.

posed is not necessary to avoid denying [the developer] a reasonable and significant use of his property. Alternative plans exist that would provide for less disturbance to the [critical area].

In reaching the above findings and conclusions, the Board explicitly referred to the testimony presented by John Flood, a neighbor and long time South River resident, who was accepted by the Board as an environmental expert, albeit the summary of his testimony was in a section separate from the conclusory findings of the Board. The Board summarized Mr. Flood's testimony as follows:

The South River contains sedimentary soils that were deposited in layers. When the soils become saturated, it becomes unstable and the clay layers become mobile. Impervious surface within the 100 foot buffer contributes to the migration of nutrients from the site and into the water. The benefits of the vegetation that is removed to provide area for impervious surface cannot be replicated by the replanting of similar vegetation. Every foot of impervious surface that is removed from the plan would reduce runoff by 6/10 of a gallon in the first one inch rain event. Unlike the subject properties, other properties in the surrounding area are buffer exempt and have been grandfathered. Comparing the subject properties to those in the surrounding community is like comparing apples to oranges. Mr. Flood created the nonstructural erosion control (living shoreline) models that have been adopted by the County and the State.

The Board also explicitly included a summary of the testimony presented by Andrew Koslow, the South Riverkeeper,[12] re-

---

12. The South Riverkeeper is apparently employed by the South River Federation and serves as an advocate for the South River by patrolling the waterway, monitoring water quality, and surveying the shoreline. *See* South River Federation Staff, http://southriverfederation.net/index. php/about-us/staff (last visited Jan. 25, 2011); *see also Ask an Expert: What exactly is a Riverkeeper?* http://www.dnr.state.md.us/mydnr/ askanexpert/river_keeper.asp (last visited Jan. 25, 2011); *see also* Waterkeeper Alliance, www.waterkeeper.org (last visited Jan. 25, 2011).

garding the adverse impact of construction near Warehouse Creek, again separate from its conclusory findings expressed in its decision. The Board summarized Mr. Koslow's testimony as follows:

> Mr. Andrew Koslow, the South Riverkeeper, testified that he has been conducting water quality sampling for the past three years. The water quality of Warehouse Creek is impaired. In 2005, 50% of the water samples had dissolved oxygen levels below 5 milligrams per liter, which is considered critical to aquatic resources by the Maryland Department of Natural Resources. In 2006, the number of water samples that had dissolved oxygen levels below 5 milligrams per liter dropped to 35%. The development proposed by [Moreland] will generate significant runoff and carry nutrients and sediment into the creek, further contributing to the decline in water quality. He does not believe that [Moreland] has shown that the development would not adversely impact water quality or fish, wildlife or plant habitat within the [critical area].

The Board also found persuasive testimony presented by several neighbors of the tracts, regarding the removal of large amounts of vegetation from the parcels causing erosion and contributing to the decline in water quality of the creek, albeit, again, the following summaries were separate from the Board's conclusory findings in its decision:

> Mr. Kenneth Malley stated that he has lived directly across the creek from the subject properties since 1986. The South River Park Community Association represents approximately 150 people in the area who are very concerned about the health of the creek and the siltation of the water. The creek will not be protected if forest cover and vegetation are removed.

> \* \* \*

> Mr. Ross Voorhees stated that ... [t]he size of the proposed houses is excessive for the lots and would have an adverse impact on the creek. Development of these lots will require the clearing of mature trees and create additional

sediment and erosion to the creek. A study funded by the County found that the quality of the creek could be improved by protecting the buffer, reducing the areas of impervious surface and reducing the sediment deposited in the creek.

*　　*　　*

Mr. Peter Quirk testified that he is concerned with how the development of the subject properties will add to the erosion problems of the creek. His house was built in 1997 and had to be located 125 feet from the water because of the required additional 25 foot expanded buffer to steep slopes. . . .

In the present case, the Board of Appeals's opinion contained clear adverse findings, as well as summaries of substantial evidence supporting those findings, in contrast with the Board's opinion in *Becker,* in which the Board failed to articulate any evidence supporting its adverse findings. Here, the Board referred to the testimony of John Flood and others supporting the findings that the removal of large amounts of vegetation, despite proposed replantings,[13] would adversely impact the water quality of Warehouse Creek, subverting the spirit and intent of the critical area program.

Moreland's assertion that the Board of Appeals must describe the evidentiary foundation for each of its findings, immediately following each finding, to enable meaningful judicial review does not have a foundation in our jurisprudence. What does have a grounding in our jurisprudence is that there has to be articulated evidence in support of a conclusory

---

13. According to Moreland, the Board's finding regarding the clearing of vegetation from the lots adversely impacting water quality is "difficult to reconcile" with the Board's favorable conclusion regarding plans for replanting on the sites. The Board determined that Moreland had offered an adequate replanting proposal, satisfying Section 3–1–207(c)(2)(iii) and (c)(iv) of the Code. Moreland's proposal to mitigate the removal of great percentages of vegetation from the parcels with replantings, as mandated by the Code, however, has no bearing on the Board's finding regarding the removal of vegetation in the first place and its impact on Warehouse Creek.

finding.[14] In *Bucktail, LLC v. County Council of Talbot County*, 352 Md. 530, 723 A.2d 440 (1999), a real estate developer, Bucktail, sought review of the denial of an application for a "growth allocation" under a local critical area program. Bucktail had purchased over ninety acres of land in Talbot County, most of which was located within the critical area, such that development was limited to "one unit per twenty acres." *Id.* at 538–39, 723 A.2d at 443. As a result, because Bucktail could construct only three dwelling units on the entire acreage without a growth allocation, the company applied to reclassify the seventy acre parcel from "Resource Conservation Area" to "Limited Development Area," in order to be able to develop fourteen houses on the property. The planning staff opined that "[Bucktail's] application has met all mandatory submittal requirements," and the Planning Commission recommended approval of Bucktail's application. *Id.* at 539, 723 A.2d at 444 (alteration in original). The County Council, however, summarily denied the application, concluding that the request "d[id] not comply with all of the Critical Area Policies and applicable design standards" outlined in the relevant zoning ordinances. *Id.* at 540, 723 A.2d at 444. The Circuit Court affirmed, determining that there was substantial evidence to support the Council's denial of the requested growth allocation.

We granted certiorari prior to any proceedings in the intermediate appellate court and reversed, reasoning that the relevant findings were merely "conclusory statements" and failed to advise the developer, "in terms of the facts and

14. Moreland refers us to *United Steelworkers of America v. Bethlehem Steel Corp.*, 298 Md. 665, 472 A.2d 62 (1984) and *Carriage Hill–Cabin John, Inc. v. Maryland Health Resources Planning Commission*, 125 Md.App. 183, 724 A.2d 745 (1999), as support for the proposition that "a reviewing court may not search the record for a basis to support an agency's conclusions." Here, we have not had to engage in any search, as the Board of Appeals clearly articulated supporting evidence, although in a separate section from its conclusory findings. It requires no great training in logic to infer reasonably that the prior recitation of relevant adverse testimony became the persuasive fulcrum which leveraged the Board into concluding as it did.

circumstances of the record," the manner in which the application failed, thereby evading "meaningful judicial review." *Id.* at 558, 723 A.2d at 453. We emphasized that because the "planning staff and the Planning Commission ha[d] recommended approval of Bucktail's project and found that it complie[d] with all applicable requirements, it [wa]s not sufficient for the Council simply to express conclusions, without pointing to the facts found by the Council that form[ed] the basis for its contrary conclusion." *Id.* at 558, 723 A.2d at 453.

In *Annapolis Market Place LLC v. Parker*, 369 Md. 689, 802 A.2d 1029 (2002), Annapolis Market Place, LLC, owned about 33 acres of land in Annapolis and sought to build a "novel mix[ed]-use" development that would integrate residential, commercial, and retail spaces. In order to do so, the company filed an application to rezone the property to C3–Commercial, which would permit such mixed-use development. The relevant provision of the county code provided that the rezoning could not be granted, however, "except on the basis of an affirmative finding that," *inter alia:*

> (3) transportation facilities, water and sewerage systems, storm drainage systems, and fire suppression facilities adequate to serve the uses allowed by the new zoning classification . . . are either in existence or programmed for construction; . . . .

*Id.* at 698, 802 A.2d at 1034. An administrative hearing officer denied the company's application, and Annapolis Market Place appealed the decision to the Board of Appeals. In the hearing before the Board, the company presented evidence regarding water supply systems, on-site storm drainage systems, sewerage systems, and roads. No evidence was presented, however, regarding the impact of the proposed development on existing fire suppression facilities, off-site storm drainage systems, or schools. The Board, nevertheless, found that Annapolis Market Place "had presented sufficient evidence to meet the standards for the requested rezoning." *Id.* at 699, 802 A.2d at 1035. Thereafter, the Circuit Court reversed the order of the Board, reasoning that "no storm water management plan was ever presented to the Board" and "no showing was made

that the schools in the area were adequate" under the requested zoning classification, such that there was no evidentiary basis for the Board's finding; the Court of Special Appeals affirmed. *Id.* at 701, 802 A.2d at 1036.

We affirmed, reasoning that there was no evidentiary basis for the Board's findings regarding the adequacy of the fire suppression facilities, storm drainage systems, or schools, to support the zoning reclassification. Most notably, we emphasized that the company failed to present "one scintilla of evidence that indicate[d] that the schools [we]re adequate to serve the development" of the property with apartments, as Annapolis Marketplace had proposed. *Id.* at 722, 802 A.2d at 1049 (alteration in original).

Similarly, in *Mastandrea v. North,* 361 Md. 107, 760 A.2d 677 (2000), *superceded by statute on other grounds as stated in Chesley v. City of Annapolis,* 176 Md.App. 413, 933 A.2d 475 (2007), the Mastandreas purchased land to which they made substantial improvements, including pathways to accommodate their disabled daughter's wheelchair. A portion of the pathways were placed within the critical area buffer, although the Mastandreas failed to apply for the requisite variances from the requirements of the Talbot County critical area program. *Id.* at 113, 760 A.2d at 680. Discovery by the authorities of the unauthorized installation led, among other things, to the Mastandreas filing a variance application with the Board in an effort to validate the pathways inside the buffer. At the Board's hearing, the Mastandreas, in support of their principal argument that "the variance should be granted as a reasonable accommodation of [their daughter] Leah's disability so that she could access the pier and enjoy the shoreline of Glebe Creek," offered testimony and exhibits:

They explained that the pathways were located to allow a wheelchair to get close enough that Leah could enjoy the waterfront, but not so close as to be dangerous. According to the Mastandreas, the natural slope and the soil composition of the lot near the shoreline (except for the direct pier access) did not permit wheelchair access directly to the waterfront. Placing the pathways outside the 100 foot

buffer, however, would deny a wheelchair occupant access to and enjoyment of the waterfront, they contended. The pathways permitted Leah to enjoy the natural and recreational aspects of her family's waterfront lot and were the only means by which Leah could accompany her brothers and sisters on walks and other activities on the lot. . . . The (brick-in-concrete) pier access pathway was designed to prevent a wheelchair from gaining momentum on the natural downslope from the house to the water. A pathway constructed in a straight line from the house to the pier, without the slope break provided by the Mastandreas's construction, would create a dangerous situation for a person confined to a wheelchair.

*Id.* at 115–16, 760 A.2d at 681–82. The Mastandreas also presented testimony by an environmental consultant, accepted as an expert by the Board, that the brick-in-sand construction of the pathways actually reduced the runoff of harmful materials into the creek:

An environmental consultant, Ronald Gatton, testified that he was familiar with the Mastandreas's property and the intent of the Critical Area laws to reduce the amount of runoff into the Chesapeake Bay and its tributaries. Mr. Gatton testified that the soil of the lot was one of the heaviest clay soils that he had ever tested. He conducted an infiltration test on the brick-in-sand path and determined that water permeated the brick-in-sand pathway faster than the surrounding undisturbed soil, making the path three times as permeable as the surrounding lawn. Mr. Gatton stated that because the natural soil conditions in the area tended to be very stiff, with a "plastic" quality, it was his opinion that the pathway parallel to the creek actually intercepts much of the runoff from the lawn between the house and the path before entering Glebe Creek.

*Id.* at 116–17, 760 A.2d at 682 (footnotes omitted). The Board granted legitimizing variances for the existing pathways, reasoning that the paths provided reasonable access to the waterfront, accommodating Leah's disability, and also found persuasive testimony presented regarding the permea-

bility enhancement of the brick-in-sand pathway. The Circuit Court reversed, determining that Leah's disability was not an appropriate consideration under the local critical area law, and that the Mastandreas had failed to satisfy the pertinent variance criteria.

We granted certiorari prior to any proceedings in the intermediate appellate court and reversed, determining that the Board had clearly articulated evidence in support of its finding that granting the variances conformed with the local critical area law and provided a reasonable accommodation of Leah's disability. We emphasized that the Board had recognized, based upon the Mastandreas's expert's testimony, that the brick-in-sand path dramatically improved permeability, safeguarding the water quality and wildlife of Glebe Creek. *Id.* at 142, 760 A.2d at 696.

In *Alviani v. Dixon,* 365 Md. 95, 775 A.2d 1234 (2001), Phyllis Dixon and Jonathan Aaron requested a special exception and variances from applicable zoning ordinances in order to construct an automotive service facility in Anne Arundel County, near Route 50. An administrative hearing officer denied the special exception and variance requests, and the Board of Appeals reversed, finding that the applicants had satisfied the various zoning criteria. Specifically, the Board determined that the variances "would not alter the essential character of the area as the neighborhood is mixed with residential and commercial uses and is impacted by its proximity to Route 50." *Id.* at 106, 775 A.2d at 1240. The Circuit Court and the Court of Special Appeals affirmed.

Before us, several neighbors protesting the granting of the special exception and variance requests asserted that the Board of Appeals "failed to make the necessary findings required in order to grant a variance," alleging that the Board failed to properly define the relevant neighborhood that was considered when the Board determined that the variances would not affect the neighborhood. *Id.* at 117, 775 A.2d at 1247. We disagreed, reasoning that the Board amply described the neighborhood as "developed with a mix of residen-

tial and commercial uses" and "heavily impacted" by its close proximity to Route 50. *Id.* at 119, 775 A.2d at 1248. The Board's description, we reasoned, was "precise enough to enable a party or an appellate court to comprehend the area that the Board considered when deciding to grant the variances." *Id.*

■ When the Board of Appeals merely states conclusions, without pointing to the evidentiary bases for those conclusions, such findings are not amenable to meaningful judicial review and a remand is warranted, as we determined in *Bucktail* and *Annapolis Market Place.* In contrast, our discussions in *Mastandrea* and *Alviani* make clear, that when the Board of Appeals refers to evidence in the record in support of its findings, meaningful judicial review is possible. The present case falls within the ambit of the latter cases, because, in its determination that the Moreland variances should be denied, the Board explicitly summarized evidence presented by several witnesses supporting its conclusions, albeit in a separate section, enabling meaningful judicial review. That evidence, intellectually and logically, can be viewed only as bearing on what persuaded the Board to conclude as it did.

We obviously differ from our Circuit Court and Court of Special Appeals colleagues in their decisions that the separation of the findings from the evidence in the present case obviated meaningful judicial review. We can discern no statutory or jurisprudential basis for the conclusion that summarizing the evidence in a separate section deprived the Board's conclusory findings of adequate evidentiary support. Semantically, on this record, to find the organizational structure of the Board's written decision defective or incomprehensible would be to elevate form over substance. Rather, the Board clearly articulated the evidence in support of its findings, referring to the testimony presented by John Flood, as well as others, regarding detriment to the water quality of Warehouse Creek posed by the construction.[15] That evidence, as con-

---

**15.** In oral argument before us, counsel for Moreland suggested that the Board of Appeals, in addition to adequately explaining its findings,

ceded by the parties before us, was substantial, namely that the water quality of Warehouse Creek was "impaired" and would be adversely impacted by the proposed construction due to the large area of impervious surface, "contribut[ing] to the migration of nutrients from the site and into the water," further compounded by the removal of mature trees and vegetation from the buffer, which "cannot be replicated by the replanting of similar vegetation."

In sum, meaningful judicial review was possible in the present case, because the Board of Appeals summarized substantial evidence in support of its conclusory findings. Because the Board marshaled the evidence in its written decision in support of its conclusion, at least, that Moreland failed to carry the day as to the requirements in Sections 3–1–207(b)(5)(i) and (c)(2)(v), the Board's decision should be affirmed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT WITH DIRECTIONS TO AFFIRM THE DECISION OF THE BOARD OF APPEALS OF ANNE ARUNDEL COUNTY. COSTS TO BE PAID BY RESPONDENTS.**

---

must also give "guidance" to the applicant on what it must prove or do differently than what it did here to successfully secure a variance. No such requirement is set forth in Section 3–1–207 of the Anne Arundel County Code, nor Section 8–1808(d) of the Natural Resources Article, governing the granting of variances.